## DUNN, GOVERNOR OF TENNESSEE,
### ET AL. *v.* BLUMSTEIN

No. 70–13.   Argued November 16, 1971—Decided March 21, 1972

MARSHALL, J., delivered the opinion of the Court, in which DOUG-
LAS, BRENNAN, STEWART, and WHITE, JJ., joined. BLACKMUN, J.,
filed an opinion concurring in the result, *post,* p. 360. BURGER, C. J.,
filed a dissenting opinion, *post,* p. 363. POWELL and REHNQUIST,
JJ., took no part in the consideration or decision of the case.

*Robert H. Roberts,* Assistant Attorney General of
Tennessee, argued the cause for appellants. With him
on the brief were *David M. Pack,* Attorney General, and
*Thomas E. Fox,* Deputy Attorney General.

*James F. Blumstein, pro se,* argued the cause for
appellee. With him on the brief were *Charles Morgan,
Jr.,* and *Norman Siegel.*

*Henry P. Sailer* and *William A. Dobrovir* filed a brief
for Common Cause as *amicus curiae* urging affirmance.

MR. JUSTICE MARSHALL delivered the opinion of the
Court.

Various Tennessee public officials (hereinafter Ten-
nessee) appeal from a decision by a three-judge federal
court holding that Tennessee's durational residence re-
quirements for voting violate the Equal Protection Clause
of the United States Constitution. The issue arises in a
class action for declaratory and injunctive relief brought
by appellee James Blumstein. Blumstein moved to
Tennessee on June 12, 1970, to begin employment as an
assistant professor of law at Vanderbilt University in
Nashville. With an eye toward voting in the upcoming
August and November elections, he attempted to register
to vote on July 1, 1970. The county registrar refused to
register him, on the ground that Tennessee law author-
izes the registration of only those persons who, at the
time of the next election, will have been residents of the
State for a year and residents of the county for three
months.

After exhausting state administrative remedies, Blum-
stein brought this action challenging these residence re-

quirements on federal constitutional grounds.[1]   A three-judge court, convened pursuant to 28 U. S. C. §§ 2281, 2284, concluded that Tennessee's durational residence

---

[1] Involved here are provisions of the Tennessee Constitution, as well as portions of the Tennessee Code. Article IV, § 1, of the Tennessee Constitution, provides in pertinent part:

"Right to vote—Election precincts . . . .—Every person of the age of twenty-one years, being a citizen of the United States, and a resident of this State for twelve months, and of the county wherein such person may offer to vote for three months, next preceding the day of election, shall be entitled to vote for electors for President and Vice-President of the United States, members of the General Assembly and other civil officers for the county or district in which such person resides; and there shall be no other qualification attached to the right of suffrage.

"The General Assembly shall have power to enact laws requiring voters to vote in the election precincts in which they may reside, and laws to secure the freedom of elections and the purity of the ballot box."

Section 2–201, Tenn. Code Ann. (Supp. 1970) provides:

"Qualifications of voters.—Every person of the age of twenty-one (21) years, being a citizen of the United States and a resident of this state for twelve (12) months, and of the county wherein he may offer his vote for three (3) months next preceding the day of election, shall be entitled to vote for members of the general assembly and other civil officers for the county or district in which he may reside."

Section 2–304, Tenn. Code Ann. (Supp. 1970) provides:

"Persons entitled to permanently register—Required time for registration to be in effect prior to election.—All persons qualified to vote under existing laws at the date of application for registration, including those who will arrive at the legal voting age by the date of the next succeeding primary or general election established by statute following the date of their application to register (those who become of legal voting age before the date of a general election shall be entitled to register and vote in a legal primary election selecting nominees for such general election), who will have lived in the state for twelve (12) months and in the county for which they applied for registration for three (3) months by the date of the next succeeding election shall be entitled to permanently register as voters under the provisions of this chapter provided,

requirements were unconstitutional (1) because they impermissibly interfered with the right to vote and (2) because they created a "suspect" classification penalizing some Tennessee residents because of recent interstate movement.[2]  337 F. Supp. 323 (MD Tenn. 1970).  We noted probable jurisdiction, 401 U. S. 934 (1971).  For the reasons that follow, we affirm the decision below.[3]

however, that registration or re-registration shall not be permitted within thirty (30) days of any primary or general election provided for by statute.  If a registered voter in any county shall have changed his residence to another county, or to another ward, precinct, or district within the same county, or changed his name by marriage or otherwise, within ninety (90) days prior to the date of an election, he shall be entitled to vote in his former ward, precinct or district of registration."

[2] On July 30, the District Court refused to grant a preliminary injunction permitting Blumstein and members of the class he represented to vote in the August 6 election; the court noted that to do so would be "so obviously disruptive as to constitute an example of judicial improvidence."  The District Court also denied a motion that Blumstein be allowed to cast a sealed provisional ballot for the election.

At the time the opinion below was filed, the next election was to be held in November 1970, at which time Blumstein would have met the three-month part of Tennessee's durational residency requirements.  The District Court properly rejected the State's position that the alleged invalidity of the three-month requirement had been rendered moot, and the State does not pursue any mootness argument here.  Although appellee now can vote, the problem to voters posed by the Tennessee residence requirements is " 'capable of repetition, yet evading review.' "  *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969); *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911).  In this case, unlike *Hall* v. *Beals,* 396 U. S. 45 (1969), the laws in question remain on the books, and Blumstein has standing to challenge them as a member of the class of people affected by the presently written statute.

[3] The important question in this case has divided the lower courts.  Durational residence requirements ranging from three months to one year have been struck down in *Burg* v. *Canniffe,* 315 F. Supp. 380 (Mass. 1970); *Affeldt* v. *Whitcomb,* 319 F. Supp. 69 (ND

## I

The subject of this lawsuit is the durational residence requirement. Appellee does not challenge Tennessee's power to restrict the vote to bona fide Tennessee residents. Nor has Tennessee ever disputed that appellee was a bona fide resident of the State and county when he attempted to register.[4] But Tennessee insists that, in addition to *being* a resident, a would-be voter must *have been* a resident for a year in the State and three months in the county. It is this additional *durational* residence requirement that appellee challenges.

Durational residence laws penalize those persons who have traveled from one place to another to establish a new residence during the qualifying period. Such laws divide residents into two classes, old residents and new residents, and discriminate against the latter to the extent

Ind. 1970); *Lester* v. *Board of Elections for District of Columbia,* 319 F. Supp. 505 (DC 1970); *Bufford* v. *Holton,* 319 F. Supp. 843 (ED Va. 1970); *Hadnott* v. *Amos,* 320 F. Supp. 107 (MD Ala. 1970); *Kohn* v. *Davis,* 320 F. Supp. 246 (Vt. 1070); *Keppel* v. *Donovan,* 326 F. Supp. 15 (Minn. 1970); *Andrews* v. *Cody,* 327 F. Supp. 793 (MDNC 1971), as well as this case. Other district courts have upheld durational residence requirements of a similar variety. *Howe* v. *Brown,* 319 F. Supp. 862 (ND Ohio 1970); *Ferguson* v. *Williams,* 330 F. Supp. 1012 (ND Miss. 1971); *Cocanower* v. *Marston,* 318 F. Supp. 402 (Ariz. 1970); *Fitzpatrick* v. *Board of Election Commissioners* (ND Ill. 1970); *Piliavin* v. *Hoel,* 320 F. Supp. 66 (WD Wis. 1970); *Epps* v. *Logan* (No. 9137, WD Wash. 1970); *Fontham* v. *McKeithen,* 336 F. Supp. 153 (ED La. 1971). In *Sirak* v. *Brown* (Civ. No. 70–164, SD Ohio 1970), the District Judge refused to convene a three-judge court and summarily dismissed the complaint.

[4] Noting the lack of dispute on this point, the court below specifically found that Blumstein had no intention of leaving Nashville and was a bona fide resident of Tennessee. 337 F. Supp. 323, 324.

of totally denying them the opportunity to vote.[5]  The constitutional question presented is whether the Equal Protection Clause of the Fourteenth Amendment permits a State to discriminate in this way among its citizens.

To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification.  Cf. *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968).  In considering laws challenged under the Equal Protection Clause, this Court has evolved more than one test, depending upon the interest affected or the classification involved.[6]  First, then, we must determine what standard of review is appropriate.  In the present case, whether we look to the benefit withheld by the classification (the opportunity to vote) or the basis for the classification (recent interstate travel) we conclude that the State must show a substantial and compelling reason for imposing durational residence requirements.

---

[5] While it would be difficult to determine precisely how many would-be voters throughout the country cannot vote because of durational residence requirements, but see Cocanower & Rich, Residency Requirements for Voting, 12 Ariz. L. Rev. 477, 478 and n. 8 (1970), it is worth noting that during the period 1947–1970 an average of approximately 3.3% of the total national population moved interstate each year.  (An additional 3.2% of the population moved from one county to another *intrastate* each year.)  U. S. Dept. of Commerce, Bureau of the Census, Current Population Reports, Population Characteristics, Series P–20, No. 210, Jan. 15, 1971, Table 1, pp. 7–8.

[6] Compare *Kramer* v. *Union Free School District,* 395 U. S. 621 (1969), and *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942), with *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); compare *McLaughlin* v. *Florida,* 379 U. S. 184 (1964), *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966), and *Graham* v. *Richardson,* 403 U. S. 365 (1971), with *Morey* v. *Doud,* 354 U. S. 457 (1957), and *Allied Stores of Ohio* v. *Bowers,* 358 U. S. 522 (1959).

## A

Durational residence requirements completely bar from voting all residents not meeting the fixed durational standards. By denying some citizens the right to vote, such laws deprive them of " 'a fundamental political right, . . . preservative of all rights.' " *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964). There is no need to repeat now the labors undertaken in earlier cases to analyze this right to vote and to explain in detail the judicial role in reviewing state statutes that selectively distribute the franchise. In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. See, *e. g., Evans* v. *Cornman,* 398 U. S. 419, 421–422, 426 (1970); *Kramer* v. *Union Free School District,* 395 U. S. 621, 626–628 (1969); *Cipriano* v. *City of Houma,* 395 U. S. 701, 706 (1969); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 667 (1966); *Carrington* v. *Rash,* 380 U. S. 89, 93–94 (1965); *Reynolds* v. *Sims, supra.* This "equal right to vote," *Evans* v. *Cornman, supra,* at 426, is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways. See, *e. g., Carrington* v. *Rash, supra,* at 91; *Oregon* v. *Mitchell,* 400 U. S. 112, 144 (opinion of DOUGLAS, J.), 241 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.), 294 (opinion of STEWART, J., concurring and dissenting, with whom BURGER, C. J., and BLACKMUN, J., joined). But, as a general matter, "before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny." *Evans* v. *Cornman, supra,* at 422; see *Bullock* v. *Carter, ante,* p. 134, at 143.

Tennessee urges that this case is controlled by *Drueding* v. *Devlin,* 380 U. S. 125 (1965). *Drueding* was a decision upholding Maryland's durational residence requirements. The District Court tested those requirements by the equal protection standard applied to ordinary state regulations: whether the exclusions are reasonably related to a permissible state interest. 234 F. Supp. 721, 724–725 (Md. 1964). We summarily affirmed *per curiam* without the benefit of argument. But if it was not clear then, it is certainly clear now that a more exacting test is required for any statute that "place[s] a condition on the exercise of the right to vote." *Bullock* v. *Carter, supra,* at 143. This development in the law culminated in *Kramer* v. *Union Free School District, supra.* There we canvassed in detail the reasons for strict review of statutes distributing the franchise, 395 U. S., at 626–630, noting *inter alia* that such statutes "constitute the foundation of our representative society." We concluded that if a challenged statute grants the right to vote to some citizens and denies the franchise to others, "the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest." *Id.,* at 627 (emphasis added); *Cipriano* v. *City of Houma, supra,* at 704; *City of Phoenix* v. *Kolodziejski,* 399 U. S. 204, 205, 209 (1970). Cf. *Harper* v. *Virginia Board of Elections, supra,* at 670. This is the test we apply here.[7]

---

[7] Appellants also rely on *Pope* v. *Williams,* 193 U. S. 621 (1904). Carefully read, that case simply *holds* that federal constitutional rights are not violated by a state provision requiring a person who enters the State to make a "declaration of his intention to become a citizen before he can have the right to be registered as a voter and to vote in the State." *Id.,* at 634. In other words, the case simply stands for the proposition that a State may require voters to be bona fide residents. See *infra,* at 343–344. To the extent that dicta in that opinion are inconsistent with the test we apply or the result we reach today, those dicta are rejected.

338

## B

This exacting test is appropriate for another reason, never considered in *Drueding:* Tennessee's durational residence laws classify bona fide residents on the basis of recent travel, penalizing those persons, and only those persons, who have gone from one jurisdiction to another during the qualifying period. Thus, the durational residence requirement directly impinges on the exercise of a second fundamental personal right, the right to travel.

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *United States* v. *Guest,* 383 U. S. 745, 758 (1966). See *Passenger Cases,* 7 How. 283, 492 (1849) (Taney, C. J.); *Crandall* v. *Nevada,* 6 Wall. 35, 43–44 (1868); *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869); *Edwards* v. *California,* 314 U. S. 160 (1941); *Kent* v. *Dulles,* 357 U. S. 116, 126 (1958); *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631, 634 (1969); *Oregon* v. *Mitchell,* 400 U. S., at 237 (separate opinon of BRENNAN, WHITE, and MARSHALL, JJ.), 285–286 (STEWART, J., concurring and dissenting, with whom BURGER, C. J., and BLACKMUN, J., joined). And it is clear that the freedom to travel includes the "freedom to enter and abide in any State in the Union," *id.,* at 285. Obviously, durational residence laws single out the class of bona fide state and county residents who have recently exercised this constitutionally protected right, and penalize such travelers directly. We considered such a durational residence requirement in *Shapiro* v. *Thompson, supra,* where the pertinent statutes imposed a one-year waiting period for interstate migrants as a condition to receiving welfare benefits. Although in *Shapiro* we specifically did not decide whether durational residence requirements could be used to determine voting eligibility,

*id.,* at 638 n. 21, we concluded that since the right to travel was a constitutionally protected right, "any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." *Id.,* at 634. This compelling-state-interest test was also adopted in the separate concurrence of Mr. Justice Stewart. Preceded by a long line of cases recognizing the constitutional right to travel, and repeatedly reaffirmed in the face of attempts to disregard it, see *Wyman* v. *Bowens,* 397 U. S. 49 (1970), and *Wyman* v. *Lopez,* 404 U. S. 1055 (1972), *Shapiro* and the compelling-state-interest test it articulates control this case.

Tennessee attempts to distinguish *Shapiro* by urging that "the vice of the welfare statute in *Shapiro* . . . was its objective to deter interstate travel." Brief for Appellants 13. In Tennessee's view, the compelling-state-interest test is appropriate only where there is "some evidence to indicate a deterrence of or infringement on the right to travel . . . ." *Ibid.* Thus, Tennessee seeks to avoid the clear command of *Shapiro* by arguing that durational residence requirements for voting neither seek to nor actually do deter such travel. In essence, Tennessee argues that the right to travel is not abridged here in any constitutionally relevant sense.

This view represents a fundamental misunderstanding of the law.[8] It is irrelevant whether disenfranchisement or denial of welfare is the more potent deterrent to travel. *Shapiro* did not rest upon a finding that denial of welfare actually deterred travel. Nor have other "right to travel"

---

[8] We note that in the Voting Rights Act of 1965, as amended, Congress specifically found that a durational residence requirement "denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines . . . ." 84 Stat. 316, 42 U. S. C. § 1973aa–1 (a) (2).

cases in this Court always relied on the presence of actual deterrence.[9] In *Shapiro* we explicitly stated that the compelling-state-interest test would be triggered by "any classification which serves to *penalize* the exercise of that right [to travel] . . . ." *Id.*, at 634 (emphasis added); see *id.*, at 638 n. 21.[10] While noting the frank legislative purpose to deter migration by the poor, and speculating that "[a]n indigent who desires to migrate . . . will doubtless hesitate if he knows that he must risk" the loss of benefits, *id.*, at 629, the majority found no need to dispute the "evidence that few welfare recipients have in fact been deterred [from moving] by residence requirements." *Id.*, at 650 (Warren, C. J., dissenting); see also *id.*, at 671–672 (Harlan, J., dissenting). Indeed, none of the litigants had themselves been deterred. Only last Term, it was specifically noted that because a durational

---

[9] For example, in *Crandall* v. *Nevada*, 6 Wall. 35 (1868), the tax imposed on persons leaving the State by commercial carrier was only $1, certainly a minimal deterrent to travel. But in declaring the tax unconstitutional, the Court reasoned that "if the State can tax a railroad passenger one dollar, it can tax him one thousand dollars," *id.*, at 46. In *Ward* v. *Maryland*, 12 Wall. 418 (1871), the tax on nonresident traders was more substantial, but the Court focused on its discriminatory aspects, without anywhere considering the law's effect, if any, on trade or tradesmen's choice of residence. Cf. *Chalker* v. *Birmingham & N. W. R. Co.*, 249 U. S. 522, 527 (1919); but see *Williams* v. *Fears*, 179 U. S. 270 (1900). In *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60, 79–80 (1920), the Court held that New York could not deny nonresidents certain small personal exemptions from the state income tax allowed residents. The amounts were certainly insufficient to influence any employee's choice of residence. Compare *Toomer* v. *Witsell*, 334 U. S. 385 (1948), with *Mullaney* v. *Anderson*, 342 U. S. 415 (1952).

[10] Separately concurring, MR. JUSTICE STEWART concluded that quite apart from any purpose to deter, "a law that so clearly *impinges* upon the constitutional right of interstate travel must be shown to reflect a *compelling* governmental interest." *Id.*, at 643–644 (first emphasis added). See also *Graham* v. *Richardson*, 403 U. S., at 375.

residence requirement for voting "operates to *penalize* those persons, and only those persons, who have exercised their constitutional right of interstate migration . . . , [it] may withstand constitutional scrutiny only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." *Oregon* v. *Mitchell,* 400 U. S., at 238 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.) (emphasis added).

Of course, it is true that the two individual interests affected by Tennessee's durational residence requirements are affected in different ways. Travel is permitted, but only at a price; voting is prohibited. The right to travel is merely penalized, while the right to vote is absolutely denied. But these differences are irrelevant for present purposes. *Shapiro* implicitly realized what this Court has made explicit elsewhere:

> "It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. . . . 'Constitutional rights would be of little value if they could be . . . indirectly denied' . . . ." *Harman* v. *Forssenius,* 380 U. S. 528, 540 (1965).[11]

See also *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), and cases cited therein; *Spevack* v. *Klein,* 385 U. S. 511, 515 (1967). The right to travel is an *"unconditional* personal right,"* a right whose exercise may not be conditioned. *Shapiro* v. *Thompson,* 394 U. S., at 643 (STEWART, J., concurring) (emphasis added); *Oregon* v. *Mitchell, supra,* at 292 (STEWART, J., concurring and dissenting,

---

[11] In *Harman,* the Court held that a Virginia law which allowed federal voters to qualify either by paying a poll tax or by filing a certificate of residence six months before the election "handicap[ped] exercise" of the right to participate in federal elections free of poll taxes, guaranteed by the Twenty-fourth Amendment. *Id.,* at 541.

with whom BURGER, C. J., and BLACKMUN, J., joined). Durational residence laws impermissibly condition and penalize the right to travel by imposing their prohibitions on only those persons who have recently exercised that right.[12] In the present case, such laws force a person who wishes to travel and change residences to choose between travel and the basic right to vote. Cf. *United States* v. *Jackson*, 390 U. S. 570, 582–583 (1968). Absent a compelling state interest, a State may not burden the right to travel in this way.[13]

## C

In sum, durational residence laws must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are *"necessary* to promote a *compelling* governmental interest."* *Shapiro* v. *Thompson, supra,* at 634 (first emphasis added); *Kramer* v. *Union Free School District,* 395 U. S., at 627. Thus phrased, the constitutional question may sound like a mathematical formula. But legal "tests" do not have the precision of mathe-

[12] Where, for example, an interstate migrant loses his driver's license because the new State has a higher age requirement, a different constitutional question is presented. For in such a case, the new State's age requirement is not a *penalty* imposed solely because the newcomer is a new resident; instead, all residents, old and new, must be of a prescribed age to drive. See *Shapiro* v. *Thompson,* 394 U. S. 618, 638 n. 21 (1969).

[13] As noted *infra,* at 343–344, States may show an overriding interest in imposing an appropriate bona fide residence requirement on would-be voters. One who travels out of a State may no longer be a bona fide resident, and may not be allowed to vote in the old State. Similarly, one who travels to a new State may, in some cases, not establish bona fide residence and may be ineligible to vote in the new State. Nothing said today is meant to cast doubt on the validity of appropriately defined and uniformly applied bona fide residence requirements.

matical formulas. The key words emphasize a matter of degree: that a heavy burden of justification is on the State, and that the statute will be closely scrutinized in light of its asserted purposes.

It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *United States* v. *Robel,* 389 U. S. 258, 265 (1967), and must be "tailored" to serve their legitimate objectives. *Shapiro* v. *Thompson, supra,* at 631. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means." *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960).

## II

We turn, then, to the question of whether the State has shown that durational residence requirements are needed to further a sufficiently substantial state interest. We emphasize again the difference between bona fide residence requirements and durational residence requirements. We have in the past noted approvingly that the States have the power to require that voters be bona fide residents of the relevant political subdivision. *E. g., Evans* v. *Cornman,* 398 U. S., at 422; *Kramer* v. *Union Free School District, supra,* at 625; *Carrington* v. *Rash,* 380 U. S., at 91; *Pope* v. *Williams,* 193 U. S. 621 (1904).[14] An appropriately defined and uniformly applied require-

---

[14] See n. 7, *supra.*

ment of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny.[15] But *durational* residence requirements, representing a separate voting qualification imposed on bona fide residents, must be separately tested by the stringent standard. Cf. *Shapiro* v. *Thompson, supra,* at 636.

It is worth noting at the outset that Congress has, in a somewhat different context, addressed the question whether durational residence laws further compelling state interests. In § 202 of the Voting Rights Act of 1965, added by the Voting Rights Act Amendments of 1970, Congress outlawed state durational residence requirements for presidential and vice-presidential elections, and prohibited the States from closing registration more than 30 days before such elections. 42 U. S. C. § 1973aa–1. In doing so, it made a specific finding that durational residence requirements and more restrictive registration practices do "not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections." 42 U. S. C. § 1973aa–1 (a)(6). We upheld this portion of the Voting Rights Act in *Oregon* v. *Mitchell, supra.* In our present case, of course, we deal with congressional, state, and local elections, in which the State's interests are arguably somewhat different; and, in addition, our function is not merely to determine whether there was a reasonable basis for Congress' findings. However, the congressional finding which forms the basis for the Federal Act is a useful background for the discussion that follows.

---

[15] See *Fontham* v. *McKeithen,* 336 F. Supp., at 167–168 (Wisdom, J., dissenting); *Pope* v. *Williams,* 193 U. S. 621 (1904); and n. 7, *supra.*

Tennessee tenders "two basic purposes" served by its durational residence requirements:

"(1) INSURE PURITY OF BALLOT BOX— Protection against fraud through colonization and inability to identify persons offering to vote, and

"(2) KNOWLEDGEABLE   V O T E R — Afford some surety that the voter has, in fact, become a member of the community and that as such, he has a common interest in all matters pertaining to its government and is, therefore, more likely to exercise his right more intelligently." Brief for Appellants 15, citing 18 Am. Jur., Elections, § 56, p. 217.

We consider each in turn.

## A

Preservation of the "purity of the ballot box" is a formidable-sounding state interest. The impurities feared, variously called "dual voting" and "colonization," all involve voting by nonresidents, either singly or in groups. The main concern is that nonresidents will temporarily invade the State or county, falsely swear that they are residents to become eligible to vote, and, by voting, allow a candidate to win by fraud. Surely the prevention of such fraud is a legitimate and compelling government goal. But it is impossible to view durational residence requirements as necessary to achieve that state interest.

Preventing fraud, the asserted evil that justifies state lawmaking, means keeping nonresidents from voting. But, by definition, a durational residence law bars *newly arrived* residents from the franchise along with nonresidents. The State argues that such sweeping laws are necessary to prevent fraud because they are needed to identify bona fide residents. This contention is particu-

larly unconvincing in light of Tennessee's total statutory scheme for regulating the franchise.

Durational residence laws may once have been necessary to prevent a fraudulent evasion of state voter standards, but today in Tennessee, as in most other States,[16] this purpose is served by a system of voter registration. Tenn. Code Ann. § 2–301 *et seq.* (1955 and Supp. 1970); see *State* v. *Weaver,* 122 Tenn. 198, 122 S. W. 465 (1909). Given this system, the record is totally devoid of any evidence that durational residence requirements are in fact necessary to identify bona fide residents. The qualifications of the would-be voter in Tennessee are determined when he registers to vote, which he may do until 30 days before the election. Tenn. Code Ann. § 2–304. His qualifications—including bona fide residence—are established then by oath. Tenn. Code Ann. § 2–309. There is no indication in the record that Tennessee routinely goes behind the would-be voter's oath to determine his qualifications. Since false swearing is no obstacle to one intent on fraud, the existence of burdensome voting qualifications like durational residence requirements cannot prevent corrupt nonresidents from fraudulently registering and voting. As long as the State relies on the oath-swearing system to establish qualifications, a durational residence requirement adds nothing to a simple residence requirement in the effort to stop fraud. The nonresident intent on committing election fraud will as quickly and effectively swear that he has been a resident for the requisite period of time as he would swear that he was simply a resident. Indeed, the durational residence requirement becomes an effective voting obstacle

---

[16] See, *e. g.,* Cocanower & Rich, 12 Ariz. L. Rev., at 499; MacLeod & Wilberding, State Voting Residency Requirements and Civil Rights, 38 Geo. Wash. L. Rev. 93, 113 (1969).

only to residents who tell the truth and have no fraudulent purposes.

Moreover, to the extent that the State makes an enforcement effort after the oath is sworn, it is not clear what role the durational residence requirement could play in protecting against fraud. The State closes the registration books 30 days before an election to give officials an opportunity to prepare for the election. Before the books close, anyone may register who claims that he will meet the durational residence requirement at the time of the next election. Although Tennessee argues that this 30-day period between registration and election does not give the State enough time to verify this claim of bona fide residence, we do not see the relevance of that position to this case. As long as the State permits registration up to 30 days before an election, a lengthy durational residence requirement does not increase the amount of time the State has in which to carry out an investigation into the sworn claim by the would-be voter that he is in fact a resident.

Even if durational residence requirements imposed, in practice, a pre-election waiting period that gave voting officials three months or a year in which to confirm the bona fides of residence, Tennessee would not have demonstrated that these waiting periods were necessary. At the outset, the State is faced with the fact that it must defend two separate waiting periods of different lengths. It is impossible to see how both could be "necessary" to fulfill the pertinent state objective. If the State itself has determined that a three-month period is enough time in which to confirm bona fide residence in the State and county, obviously a one-year period cannot also be justified as "necessary" to achieve the same purpose.[17]

---

[17] Obviously, it could not be argued that the three-month waiting period is necessary to confirm residence in the county, and the one-year period necessary to confirm residence in the State. Quite

Beyond that, the job of detecting nonresidents from among persons who have registered is a relatively simple one. It hardly justifies prohibiting all newcomers from voting for even three months. To prevent dual voting, state voting officials simply have to cross-check lists of new registrants with their former jurisdictions. See Comment, Residence Requirements for Voting in Presidential Elections, 37 U. Chi. L. Rev. 359, 364 and n. 34, 374 (1970); cf. *Shapiro* v. *Thompson,* 394 U. S., at 637. Objective information tendered as relevant to the question of bona fide residence under Tennessee law—places of dwelling, occupation, car registration, driver's license, property owned, etc.[18]—is easy to doublecheck, especially in light of modern communications. Tennessee itself concedes that "[i]t might well be that these purposes can be achieved under requirements of shorter duration than that imposed by the State of Tennessee . . . ." Brief for Appellants 10. Fixing a constitutionally acceptable period is surely a matter of degree. It is sufficient to note here that 30 days appears to be an ample period of time for the State to complete whatever administrative tasks are necessary to prevent fraud—and a year, or three months, too much. This was the judgment of Congress in the context of presidential elections.[19] And, on the basis of the stat-

---

apart from the total implausibility of any suggestion that one task should take four times as long as the other, it is sufficient to note that if a person is found to be a bona fide resident of a county within the State, he is by definition a bona fide resident of the State as well.

[18] See, *e. g., Brown* v. *Hows,* 163 Tenn. 178, 42 S. W. 2d 210 (1930); *Sparks* v. *Sparks,* 114 Tenn. 666, 88 S. W. 173 (1905). See generally Tennessee Law Revision Commission, Title 2—Election Laws, Tentative Draft of October 1971, § 222 and Comment. See n. 22, *infra.*

[19] In the Voting Rights Act Amendments of 1970, Congress abolished durational residence requirements as a precondition to voting

utory scheme before us, it is almost surely the judgment of the Tennessee lawmakers as well. As the court below concluded, the cutoff point for registration 30 days before an election

> "reflects the judgment of the Tennessee Legislature that thirty days is an adequate period in which Tennessee's election officials can effect whatever measures may be necessary, in each particular case confronting them, to insure purity of the ballot and prevent dual registration and dual voting." 337 F. Supp., at 330.

It has been argued that durational residence requirements are permissible because a person who has satisfied the waiting-period requirements is conclusively presumed to be a bona fide resident. In other words, durational residence requirements are justified because they create an administratively useful conclusive presumption that recent arrivals are not residents and are therefore prop-

---

in presidential and vice-presidential elections, and prohibited the States from cutting off registration more than 30 days prior to those elections. These limits on the waiting period a State may impose prior to an election were made "with full cognizance of the possibility of fraud and administrative difficulty." *Oregon* v. *Mitchell,* 400 U. S. 112, 238 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.). With that awareness, Congress concluded that a waiting-period requirement beyond 30 days "does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections." 42 U. S. C. § 1973aa–1 (a)(6). And in sustaining § 202 of the Voting Rights Act of 1965, we found "no explanation why the 30-day period between the closing of new registrations and the date of election would not provide, in light of modern communications, adequate time to insure against . . . frauds." *Oregon* v. *Mitchell, supra,* at 239 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.). There is no reason to think that what Congress thought was unnecessary to prevent fraud in presidential elections should not also be unnecessary in the context of other elections. See *infra,* at 354.

erly barred from the franchise.[20]  This presumption, so
the argument runs, also prevents fraud, for few candi-
dates will be able to induce migration for the purpose of
voting if fraudulent voters are required to remain in
the false locale for three months or a year in order to
vote on election day.[21]

In *Carrington* v. *Rash,* 380 U. S. 89, this Court
considered and rejected a similar kind of argument in
support of a similar kind of conclusive presumption.
There, the State argued that it was difficult to tell
whether persons moving to Texas while in the military
service were in fact bona fide residents.  Thus, the State
said, the administrative convenience of avoiding difficult
factual determinations justified a blanket exclusion of all
servicemen stationed in Texas.  The presumption cre-
ated there was conclusive—" 'incapable of being overcome
by proof of the most positive character.' "  *Id.,* at 96, cit-
ing *Heiner* v. *Donnan,* 285 U. S. 312, 324 (1932).  The

---

[20] As a technical matter, it makes no sense to say that one who
has been a resident for a fixed duration is presumed to be a resident.
In order to meet the durational residence requirement, one must,
by definition, *first* establish that he is a *resident.* A durational
residence requirement is not simply a waiting period after arrival
in the State; it is a waiting period after *residence* is established.
Thus it is conceptually impossible to say that a durational residence
requirement is an administratively useful device to determine resi-
dence.  The State's argument must be that residence would be
presumed from simple *presence* in the State or county for the fixed
waiting period.

[21] It should be clear that this argument assumes that the State
will reliably determine whether the sworn claims of duration in the
jurisdiction are themselves accurate.  We have already noted that
this is unlikely.  See *supra,* at 346.  Another recurrent problem for
the State's position is the existence of *differential* durational resi-
dence requirements.  If the State presumes residence in the county
after three months in the county, there is no rational explanation for
requiring a full 12 months' presence in the State to presume resi-
dence in the State.

Court rejected this "conclusive presumption" approach as violative of the Equal Protection Clause. While many servicemen in Texas were not bona fide residents, and therefore properly ineligible to vote, many servicemen clearly were bona fide residents. Since "more precise tests" were available "to winnow successfully from the ranks . . . those whose residence in the State is bona fide," conclusive presumptions were impermissible in light of the individual interests affected. *Id.,* at 95. "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." *Id.,* at 96.

*Carrington* sufficiently disposes of this defense of durational residence requirements. The State's legitimate purpose is to determine whether certain persons in the community are bona fide residents. A durational residence requirement creates a classification that may, in a crude way, exclude nonresidents from that group. But it also excludes many residents. Given the State's legitimate purpose and the individual interests that are affected, the classification is all too imprecise. See *supra,* at 343. In general, it is not very difficult for Tennessee to determine on an individualized basis whether one recently arrived in the community is in fact a resident, although of course there will always be difficult cases. Tennessee has defined a test for bona fide residence, and appears prepared to apply it on an individualized basis in various legal contexts.[22] That test

---

[22] Tennessee's basic test for bona fide residence is (1) an intention to stay indefinitely in a place (in other words, "without a present intention of removing therefrom," *Brown* v. *Hows,* 163 Tenn., at 182, 42 S. W. 2d, at 211), joined with (2) some objective indication consistent with that intent, see n. 18, *supra.* This basic test has been applied in divorce cases, see, *e. g., Sturdavant* v. *Sturdavant,* 28 Tenn. App. 273, 189 S. W. 2d 410 (1944); *Brown* v. *Brown,* 150 Tenn. 89, 261 S. W. 959 (1924); *Sparks* v. *Sparks,* 114

could easily be applied to new arrivals. Furthermore, if it is unlikely that would-be fraudulent voters would remain in a false locale for the lengthy period imposed by durational residence requirements, it is just as unlikely that they would collect such objective indicia of bona fide residence as a dwelling, car registration, or driver's license. In spite of these things, the question of bona fide residence is settled for new arrivals by conclusive presumption, not by individualized inquiry. Cf. *Carrington* v. *Rash, supra,* at 95–96. Thus, it has always been undisputed that appellee Blumstein is himself a bona fide resident of Tennessee within the ordinary state definition of residence. But since Tennessee's presumption from failure to meet the durational residence requirements is conclusive, a showing of actual bona fide residence is irrelevant, even though such a showing would fully serve the State's purposes embodied in the presumption and would achieve those purposes with far less drastic impact on constitutionally protected interests.[23] The Equal Protection Clause places a limit on government by classification, and that limit has been exceeded here. Cf. *Shapiro* v. *Thompson,* 394 U. S., at 636; *Harman* v. *Forssenius,* 380 U. S., at 542–543; *Carrington* v. *Rash, supra,* at 95–96; *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942).

---

Tenn. 666, 88 S. W. 173 (1905); in tax cases, see, *e. g., Denny* v. *Sumner County,* 134 Tenn. 468, 184 S. W. 14 (1916); in estate cases, see, *e. g., Caldwell* v. *Shelton,* 32 Tenn. App. 45, 221 S. W. 2d 815 (1948); *Hascall* v. *Hafford,* 107 Tenn. 355, 65 S. W. 423 (1901); and in voting cases, see, *e. g., Brown* v. *Hows, supra;* Tennessee Law Revision Commission, Title 2—Election Laws, *supra,* n. 18.

[23] Indeed, in Blumstein's case, the County Election Commission explicitly rejected his offer to treat the waiting-period requirement as "a waivable guide to commission action, but rebuttable upon a proper showing of competence to vote intelligently in the primary and general election." Complaint at App. 8. Cf. *Skinner* v. *Oklahoma,* 316 U. S., at 544–545 (Stone, C. J., concurring).

Our conclusion that the waiting period is not the least restrictive means necessary for preventing fraud is bolstered by the recognition that Tennessee has at its disposal a variety of criminal laws that are more than adequate to detect and deter whatever fraud may be feared.[24] At least six separate sections of the Tennessee Code define offenses to deal with voter fraud. For example, Tenn. Code Ann. § 2–324 makes it a crime "for any person to register or to have his name registered as a qualified voter . . . when he is not entitled to be so registered . . . or to procure or induce any other person to register or be registered . . . when such person is not legally qualified to be registered as such . . . ."[25] In addition to the various criminal penalties, Tennessee permits the bona fides of a voter to be challenged on election day. Tenn. Code Ann. § 2–1309 *et seq.* (1955 and Supp. 1970). Where a State has available such remedial action

---

[24] See *Harman* v. *Forssenius,* 380 U. S., at 543 (1965) (filing of residence certificate six months before election in lieu of poll tax unnecessary to insure that the election is limited to bona fide residents in light of "numerous devices to enforce valid residence requirements"); cf. *Schneider* v. *State,* 308 U. S. 147, 164 (1939) (fear of fraudulent solicitations cannot justify permit requests since "[f]rauds may be denounced as offenses and punished by law").

[25] Tenn. Code Ann. § 2–1614 (Supp. 1970) makes it a felony for any person who "is not legally entitled to vote at the time and place where he votes or attempts to vote . . . , to vote or offer to do so," or to aid and abet such illegality. Tenn. Code Ann. § 2–2207 (1955) makes it a misdemeanor "for any person knowingly to vote in any political convention or any election held under the Constitution or laws of this state, not being legally qualified to vote . . . ," and Tenn. Code Ann. § 2–2208 (1955) makes it a misdemeanor to aid in such an offense. Tenn. Code Ann. § 2–202 (Supp. 1970) makes it an offense to vote outside the ward or precinct where one resides and is registered. Finally, Tenn. Code Ann. § 2–2209 (1955) makes it unlawful to "bring or aid in bringing any fraudulent voters into this state for the purpose of practising a fraud upon or in any primary or final election . . . ." See, *e. g., State* v. *Weaver,* 122 Tenn. 198, 112 S. W. 465 (1909).

to supplement its voter registration system, it can hardly argue that broadly imposed political disabilities such as durational residence requirements are needed to deal with the evils of fraud. Now that the Federal Voting Rights Act abolishes those residence requirements as a precondition for voting in presidential and vice-presidential elections, 42 U. S. C. § 1973aa–1, it is clear that the States will have to resort to other devices available to prevent nonresidents from voting. Especially since every State must live with this new federal statute, it is impossible to believe that durational residence requirements are necessary to meet the State's goal of stopping fraud.[26]

## B

The argument that durational residence requirements further the goal of having "knowledgeable voters" appears to involve three separate claims. The first is that such requirements "afford some surety that the voter has, in fact, become a member of the community." But here the State appears to confuse a bona fide residence requirement with a durational residence requirement. As already noted, a State does have an interest in limiting the franchise to bona fide members of the community. But this does not justify or explain the exclusion from the franchise of persons, not because their bona fide residence is questioned, but because they are recent rather than longtime residents.

The second branch of the "knowledgeable voters" justification is that durational residence requirements assure that the voter "has a common interest in all matters pertaining to [the community's] government . . . ." By this, presumably, the State means that it may require a period of residence sufficiently lengthy to impress upon

---

[26] We note that in the period since the decision below, several elections have been held in Tennessee. We have been presented with no specific evidence of increased colonization or other fraud.

its voters the local viewpoint. This is precisely the sort of argument this Court has repeatedly rejected. In *Carrington* v. *Rash,* for example, the State argued that military men newly moved into Texas might not have local interests sufficiently in mind, and therefore could be excluded from voting in state elections. This Court replied:

> "But if they are in fact residents, . . . they, as all other qualified residents, have a right to an equal opportunity for political representation. . . . 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." 380 U. S., at 94.

See 42 U. S. C. § 1973aa–1 (a)(4).

Similarly here, Tennessee's hopes for voters with a "common interest in all matters pertaining to [the community's] government" is impermissible.[27] To paraphrase what we said elsewhere, "All too often, lack of a ['common interest'] might mean no more than a different interest." *Evans* v. *Cornman,* 398 U. S., at 423. "[D]ifferences of opinion" may not be the basis for excluding any group or person from the franchise. *Cipriano* v. *City of Houma,* 395 U. S., at 705–706. "[T]he fact that newly arrived [Tennesseeans] may have a more national outlook than longtime residents, or even may retain a viewpoint characteristic of the region from which they have come, is a constitutionally impermissible reason for depriving them of their chance to influence the

---

[27] It has been noted elsewhere, and with specific reference to Tennessee law, that "[t]he historical purpose of [durational] residency requirements seems to have been to deny the vote to undesirables, immigrants and outsiders with different ideas." Cocanower & Rich, 12 Ariz. L. Rev., at 484 and nn. 44, 45, and 46. We do not rely on this alleged original purpose of durational residence requirements in striking them down today.

electoral vote of their new home State." *Hall* v. *Beals,* 396 U. S. 45, 53–54 (1969) (dissenting opinion).[28]

Finally, the State urges that a longtime resident is "more likely to exercise his right [to vote] more intelligently." To the extent that this is different from the previous argument, the State is apparently asserting an interest in limiting the franchise to voters who are knowledgeable about the issues. In this case, Tennessee argues that people who have been in the State less than a year and the county less than three months are likely to be unaware of the issues involved in the congressional, state, and local elections, and therefore can be barred from the franchise. We note that the criterion of "intelligent" voting is an elusive one, and susceptible of abuse. But without deciding as a general matter the extent to which a State can bar less knowledgeable or intelligent citizens from the franchise, cf. *Evans* v. *Cornman,* 398 U. S., at 422; *Kramer* v. *Union Free School District,* 395 U. S., at 632; *Cipriano* v. *City*

---

[28] Tennessee may be revealing this impermissible purpose when it observes:

"The fact that the voting privilege has been extended to 18 year old persons . . . increases, rather than diminishes, the need for durational residency requirements. . . . It is so generally known, as to be judicially accepted, that there are many political subdivisions in this state, and other states, wherein there are colleges, universities and military installations with sufficient student body or military personnel over eighteen years of age, as would completely dominate elections in the district, county or municipality so located. This would offer the maximum of opportunity for fraud through colonization, and permit domination by those not knowledgeable or having a common interest in matters of government, as opposed to the interest and the knowledge of permanent members of the community. Upon completion of their schooling, or service tour, they move on, leaving the community bound to a course of political expediency not of its choice and, in fact, one over which its more permanent citizens, who will continue to be affected, had no control." Brief for Appellants 15–16.

*of Houma,* 395 U. S., at 705,[29] we conclude that durational residence requirements cannot be justified on this basis.

In *Kramer* v. *Union Free School District, supra,* we held that the Equal Protection Clause prohibited New York State from limiting the vote in school-district elections to parents of school children and to property owners. The State claimed that since nonparents would be "less informed" about school affairs than parents, *id.,* at 631, the State could properly exclude the class of nonparents in order to limit the franchise to the more "interested" group of residents. We rejected that position, concluding that a "close scrutiny of [the classification] demonstrates that [it does] not accomplish this purpose with sufficient precision . . . ." *Id.,* at 632. That scrutiny revealed that the classification excluding nonparents from the franchise kept many persons from voting who were as substantially interested as those allowed to vote; given this, the classification was insufficiently "tailored" to achieve the articulated state goal. *Ibid.* See also *Cipriano* v. *City of Houma, supra,* at 706.

Similarly, the durational residence requirements in this case founder because of their crudeness as a device for

---

[29] In the 1970 Voting Rights Act, which added § 201, 42 U. S. C. § 1973aa, Congress provided that "no citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election . . . ." The term "test or device" was defined to include, in part, "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject . . . ." By prohibiting various "test[s]" and "device[s]" that would clearly assure knowledgeability on the part of voters in local elections, Congress declared federal policy that people should be allowed to vote even if they were not well informed about the issues. We upheld § 201 in *Oregon* v. *Mitchell, supra.*

achieving the articulated state goal of assuring the knowledgeable exercise of the franchise. The classifications created by durational residence requirements obviously permit any longtime resident to vote regardless of his knowledge of the issues—and obviously many longtime residents do not have any. On the other hand, the classifications bar from the franchise many other, admittedly new, residents who have become at least minimally, and often fully, informed about the issues. Indeed, recent migrants who take the time to register and vote shortly after moving are likely to be those citizens, such as appellee, who make it a point to be informed and knowledgeable about the issues. Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election,[30] the State cannot seriously maintain that it is "necessary" to reside for a year in the State and three months in the county in order to be knowledgeable about congressional, state, or even purely local elections. There is simply nothing in the record to support the conclusive presumption that residents who have lived in the State for less than a year and their county for less than three months are uninformed about elections. Cf. *Shapiro* v. *Thompson,* 394 U. S., at 631. These durational residence requirements crudely exclude large numbers of fully qualified people. Especially since Tennessee creates a waiting period by closing registration books 30 days before an election, there can be no basis for arguing that any durational residence requirement is also needed to assure knowledgeability.

It is pertinent to note that Tennessee has never made an attempt to further its alleged interest in an informed electorate in a universally applicable way. Knowledge

---

[30] H. Alexander, Financing the 1968 Election 106–113 (1971); *Affeldt* v. *Whitcomb,* 319 F. Supp., at 77; Cocanower & Rich, 12 Ariz. L. Rev., at 498.

or competence has never been a criterion for participation in Tennessee's electoral process for longtime residents. Indeed, the State specifically provides for voting by various types of absentee persons.[31] These provisions permit many longtime residents who leave the county or State to participate in a constituency in which they have only the slightest political interest, and from whose political debates they are likely to be cut off. That the State specifically permits such voting is not consistent with its claimed compelling interest in intelligent, informed use of the ballot. If the State seeks to assure intelligent use of the ballot, it may not try to serve this interest only with respect to new arrivals. Cf. *Shapiro* v. *Thompson, supra,* at 637–638.

It may well be true that new residents as a group know less about state and local issues than older residents; and it is surely true that durational residence requirements will exclude some people from voting who are totally un-

---

[31] The general provisions for absentee voting apply in part to "[a]ny registered voter otherwise qualified to vote in any election to be held in this state or any county, municipality, or other political subdivision thereof, who by reason of business, occupation, health, education, or travel, is required to be absent from the county of his fixed residence on the day of the election . . . ." Tenn. Code Ann. § 2–1602 (Supp. 1970). See generally Tenn. Code Ann. § 2–1601 *et seq.* (Supp. 1970). An alternative method of absentee voting for armed forces members and federal personnel is detailed in Tenn. Code Ann. § 2–1701 *et seq.* (Supp. 1970). Both those provisions allow persons who are still technically "residents" of the State or county to vote even though they are not physically present, and even though they are likely to be uninformed about the issues. In addition, Tennessee has an unusual provision that permits persons to vote in their *prior* residence for a period after residence has been changed. This section provides, in pertinent part: "If a registered voter in any county shall have changed his residence to another county . . . within ninety (90) days prior to the date of an election, he shall be entitled to vote in his former ward, precinct or district of registration." Tenn. Code Ann. § 2–304 (Supp. 1970). See also Tenn. Code Ann. § 2–204 (1955).

informed about election matters. But as devices to limit the franchise to knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded. They represent a requirement of knowledge unfairly imposed on only some citizens. We are aware that classifications are always imprecise. By requiring classifications to be tailored to their purpose, we do not secretly require the impossible. Here, there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months. Given the exacting standard of precision we require of statutes affecting constitutional rights, we cannot say that durational residence requirements are necessary to further a compelling state interest.

### III

Concluding that Tennessee has not offered an adequate justification for its durational residence laws, we affirm the judgment of the court below.

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, concurring in the result.

Professor Blumstein obviously could hardly wait to register to vote in his new home State of Tennessee. He arrived in Nashville on June 12, 1970. He moved into his apartment on June 19. He presented himself to the registrar on July 1. He instituted his lawsuit on July 17. Thus, his litigation was begun 35 days after his arrival on Tennessee soil, and less than 30 days after he moved into his apartment. But a primary was coming up on August 6. Usually, such zeal to exercise

the franchise is commendable. The professor, however, encountered—and, I assume, knowingly so—the barrier of the Tennessee durational residence requirement and, because he did, he instituted his test suit.

I have little quarrel with much of the content of the Court's long opinion. I concur in the result, with these few added comments, because I do not wish to be described on a later day as having taken a position broader than I think necessary for the disposition of this case.

1. In *Pope* v. *Williams,* 193 U. S. 621 (1904), Mr. Justice Peckham, in speaking for a unanimous Court that included the first Mr. Justice Harlan and Mr. Justice Holmes, said:

> "The simple matter to be herein determined is whether, with reference to the exercise of the privilege of voting in Maryland, the legislature of that State had the legal right to provide that a person coming into the State to reside should make the declaration of intent a year before he should have the right to be registered as a voter of the State.
>
> .     .     .     .     .
>
> ". . . The right of a State to legislate upon the subject of the elective franchise as to it may seem good, subject to the conditions already stated, being, as we believe, unassailable, we think it plain that the statute in question violates no right protected by the Federal Constitution.
>
> "The reasons which may have impelled the state legislature to enact the statute in question were matters entirely for its consideration, and this court has no concern with them."   193 U. S., at 632, 633–634.

I cannot so blithely explain *Pope* v. *Williams* away, as does the Court, *ante,* at 337 n. 7, by asserting that if that

opinion is "[c]arefully read," one sees that the case was concerned simply with a requirement that the new arrival declare his intention. The requirement was that he make the declaration *a year* before he registered to vote; time as well as intent was involved. For me, therefore, the Court today really overrules the holding in *Pope* v. *Williams* and does not restrict itself, as footnote 7 says, to rejecting what it says are mere dicta.

2. The compelling-state-interest test, as applied to a State's denial of the vote, seems to have come into full flower with *Kramer* v. *Union Free School District,* 395 U. S. 621, 627 (1969). The only supporting authority cited is in the "See" context to *Carrington* v. *Rash,* 380 U. S. 89, 96 (1965). But as I read *Carrington,* the standard there employed was that the voting requirements be reasonable. Indeed, in that opinion MR. JUSTICE STEWART observed, at 91, that the State has "unquestioned power to impose reasonable residence restrictions on the availability of the ballot." A like approach was taken in *McDonald* v. *Board of Election Commissioners,* 394 U. S. 802, 809 (1969), where the Court referred to the necessity of "some rational relationship to a legitimate state end" and to a statute's being set aside "only if based on reasons totally unrelated to the pursuit of that goal." I mention this only to emphasize that *Kramer* appears to have elevated the standard. And this was only three years ago. Whether *Carrington* and *McDonald* are now frowned upon, at least in part, the Court does not say. Cf. *Bullock* v. *Carter, ante,* p. 134.

3. Clearly, for me, the State does have a profound interest in the purity of the ballot box and in an informed electorate and is entitled to take appropriate steps to assure those ends. Except where federal inter-

vention properly prescribes otherwise, see *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), I see no constitutional imperative that voting requirements be the same in each State, or even that a State's time requirement relate to the 30-day measure imposed by Congress by 42 U. S. C. § 1973aa–1 (d) for presidential elections.   I assume that the Court by its decision today does not depart from either of these propositions.   I cannot be sure of this, however, for much of the opinion seems to be couched in absolute terms.

4. The Tennessee plan, based both in statute and in the State's constitution, is not ideal.   I am content that the one-year and three-month requirements be struck down for want of something more closely related to the State's interest.   It is, of course, a matter of line drawing, as the Court concedes, *ante,* at 348.   But if 30 days pass constitutional muster, what of 35 or 45 or 75?   The resolution of these longer measures, less than those today struck down, the Court leaves, I suspect, to the future.

MR. CHIEF JUSTICE BURGER, dissenting.

The holding of the Court in *Pope* v. *Williams,* 193 U. S. 621 (1904), is as valid today as it was at the turn of the century.   It is no more a denial of equal protection for a State to require newcomers to be exposed to state and local problems for a reasonable period such as one year before voting, than it is to require children to wait 18 years before voting.   Cf. *Oregon* v. *Mitchell,* 400 U. S. 112 (1970).   In both cases some informed and responsible persons are denied the vote, while others less informed and less responsible are permitted to vote.   Some lines must be drawn.   To challenge such lines by the "compelling state interest" standard is to condemn them all.   So far as I am aware, no state law has ever satisfied this seem-

ingly insurmountable standard, and I doubt one ever will, for it demands nothing less than perfection.

The existence of a constitutional "right to travel" does not persuade me to the contrary. If the imposition of a durational residency requirement for voting abridges the right to travel, surely the imposition of an age qualification penalizes the young for being young, a status I assume the Constitution also protects.