Carl A. AJELLO et al., Plaintiffs,

v.

Gloria SCHAFFER, Secretary of the State of Connecticut, et al., Defendants,

and

James F. Bingham et al., Intervenors.

Civ. No. 15284.

United States District Court, D. Connecticut.

Sept. 21, 1972.

Robert Satter, James A. Wade, Hartford, Conn., for plaintiffs.

Robert K. Killian, Atty. Gen. of Conn., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, Chief Judge.

### I.

This is another one of several lawsuits concerning related issues arising out of efforts by state authorities to reapportion the Connecticut General Assembly following the 1970 census. The plaintiffs seek to enjoin the enforcement of a Connecticut Superior Court's order that the election of state senators and representatives be held on November 7, 1972.

To put this most recent lawsuit into proper perspective, it will be helpful to view it against its complicated background of prior proceedings. Charged with the initial responsibility of reapportioning both houses of the state legislature, the General Assembly failed to promulgate a reapportionment plan during the 1971 legislative session.[1] Fol-

1. Conn.Const. art. 3, § 6 provides:
"a. The assembly and senatorial districts as now established by law shall continue until the regular session of the general assembly next after the completion of the next census of the United

lowing its unproductive efforts, a duly constituted eight-member commission of its members also tried unsuccessfully to adopt a plan. The next step in the reapportionment process was for a plan to be devised by a specially selected three-member board. The plan adopted by that board (hereinafter the board plan) was defective in some technical aspects;[2] but more importantly, it failed to meet the constitutional imperative of "one man, one vote." All of this is more fully set out in Cummings v. Meskill, 341 F.Supp. 139 (D.Conn.1972) (3-Judge District Court), and need not be repeated here. The order of the three-judge district court holding the board plan unconstitutional was appealed directly to the United States Supreme Court, Gaffney v. Cummings, Docket

States. Such general assembly shall, upon roll call, by a yea vote of at least two-thirds of the membership of each house, enact such plan of districting as is necessary to preserve a proper apportionment of representation in accordance with the principles recited in this article. Thereafter the general assembly shall decennially at its next regular session following the completion of the census of the United States, upon roll call, by a yea vote of at least two-thirds of the membership of each house, enact such plan of districting as is necessary in accordance with the provisions of this article.

"b. If the general assembly fails to enact a plan of districting by the first day of the April next following the completion of the decennial census of the United States, the governor shall forthwith appoint a commission consisting of the eight members designated by the president pro tempore of the senate, the speaker of the house of representatives, the minority leader of the senate and the minority leader of the house of representatives, each of whom shall designate two members of the commission, provided that there are members of no more than two political parties in either the senate or the house of representatives. In the event that there are members of more than two political parties in a house of the general assembly, all members of that house belonging to the parties other than that of the president pro tempore of the senate or the speaker of the house of representatives, as the case may be, shall select one of their number, who shall designate two members of the commission in lieu of the designation by the minority leader of that house.

"c. The commission shall proceed to consider the alteration of districts in accordance with the principles recited in this article and it shall submit a plan of districting to the secretary of the state by the first day of the July next suc-

ceeding the appointment of its members. No plan shall be submitted to the secretary unless it is certified by at least six members of the commission. Upon receiving such plan the secretary shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law.

"d. If by the first day of the July next succeeding the appointment of its members the commission fails to submit a plan of districting, a board of three persons shall forthwith be empaneled. The speaker of the house of representatives and the minority leader of the house of representatives shall each designate, as one member of the board, a judge of the superior court of the state, provided that there are members of no more than two political parties in the house of representatives. In the event that there are members of more than two political parties in the house of representatives, all members belonging to the parties other than that of the speaker shall select one of their number, who shall then designate, as one member of the board, a judge of the superior court of the state, in lieu of the designation by the minority leader of the house of representatives. The two members of the board so designated shall select an elector of the state as the third member.

"e. The board shall proceed to consider the alteration of districts in accordance with the principles recited in this article and shall, by the first day of the October next succeeding its selection, submit a plan of districting to the secretary. No plan shall be submitted to the secretary unless it is certified by at least two members of the board. Upon receiving such plan, the secretary shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law."

2. For example, some census blocks were completely omitted in the formation of the districts.

No. 71–1476 (May 11, 1972), which subsequently granted an application to stay the lower court's judgment. 407 U.S. 902, 92 S.Ct. 2441, 32 L.Ed.2d 679 (1972).

The result of that stay was to leave the state without any existing valid reapportionment plan. To remedy this situation, a pending state court action earlier brought to obtain rectification of the technical imperfections in the board plan was pursued, and on August 23, 1972, the Superior Court ordered correction of those technical defects and implementation of the board plan. Miller v. Schaffer, Superior Court Docket No. 173606 (August 23, 1972). At the same time, that court also ordered the board plan into effect in time for the approaching elections scheduled to be held on November 7, 1972. To facilitate an election on that date, the Superior Court also ordered that the statutory time periods for various steps in the nomination and campaign processes be telescoped to fit within the seventy-five days that remained before the election.[3]

Since the board plan reduces the total number of assembly districts from 177 to 151, some incumbents of the General Assembly now find themselves challenged by others in the newly created districts. Faced with the fact that there are now fewer offices to compete for and a shorter than usual time in which to do it, the plaintiffs instituted this action.[4]

## II. *Preliminary Considerations*

### A. *Jurisdiction*

■ This action which alleges a deprivation of constitutional rights by state action is brought under the Civil Rights Act, 42 U.S.C. § 1983, and jurisdiction of this court is conferred by 28 U.S.C. §§ 1343(3) and 1343(4). Defendants' contention that the Anti-Injunction statute, 28 U.S.C. § 2283,[5] deprives this court of jurisdiction in this civil rights action has recently been squarely considered and conclusively rejected by the Supreme Court. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

### B. *Comity*

■ Despite the absence of any restriction on the jurisdictional power of this court to enjoin state court proceedings in a case under the Civil Rights Act, the inadvisability of interfering with state court judicial proceedings in order not to disturb unduly the delicate balance which exists between the exercise of state and federal authority has been urged as a reason why this court, in the exercise of its discretion, should refrain from considering the plaintiffs' claim.[6] If the precise constitutional claim urged by the plaintiffs in this case were being raised in the presently pending appeal from the order of the Superior Court, this court would have to fully resolve whether policies of federalism require

---

3. Compare the schedule envisioned in Conn.Gen.Stats. §§ 9–381 through 9–462 with Exhibit A of the aforementioned order of the Superior Court.

4. The parties plaintiff purport to represent all citizens and voters of Connecticut who claim that their rights to vote and/or run for political office have been abridged in violation of the first and fourteenth amendments to the United States Constitution by reason of the order of the Superior Court.

5. 28 U.S.C. § 2283 provides:
 "A court of the United States may not grant an injunction to stay pro-

ceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

6. While the ruling of the Connecticut Superior Court, currently on expedited appeal to the Connecticut Supreme Court, 34 Conn.L.J. #11 at 1, 2 (Sept. 12, 1972), necessarily preceded the filing of this suit, it postdated the actions of the federal courts in this area by several months.

that this court stay further action.[7] However, this is not that case. The constitutionality of the reapportionment effected under the corrected board plan is not in issue in the state court. That question is pending before the United States Supreme Court in the appeal, Gaffney v. Cummings, *supra*. Among the many issues presented to the state Supreme Court, the only one pertinent to the constitutional issues presented here is whether that part of the order of the Superior Court instituting a "telescoped" schedule was erroneous as a matter of state law. This raises the question of whether judicial power was properly exercised to modify the time provisions which the legislature has established by statute. That issue is considerably narrower in scope than the issue of unconstitutionality raised under the Civil Rights Act. In view of this difference in the issues, not even a broad application of the principles of comity mandates that this court avoid reaching the merits of this case. Cf. Younger v. Harris, 401 U.S. 37, 54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (Stewart, J., concurring); Mitchum v. Foster, *supra*, 407 U.S. at 242, 92 S.Ct. at 2162, 32 L.Ed.2d at 718 (Stewart, J.).

### C. *Abstention*

■ Similarly, the fact that state law is an essential part of the foundation upon which this case arises does not alone warrant abstention when, at least for purposes of this suit, there is no allegation that the state law is unsettled or in need of state court construction.[8] Cf. Davis v. Mann, 377 U.S. 678, 84 S. Ct. 1441, 12 L.Ed.2d 609 (1964); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Railroad Commission of Texas v. Pullman Co., 312 U. S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

### III. *The Merits* [9]

#### A. *Generalities*

The gravamen of this complaint is that the Connecticut Superior Court order, Miller v. Schaffer, *supra*, leaves so little time for prospective candidates to campaign for the nomination of their party for the offices of state representatives and senators, and thereafter in the general elections, as to deny voters and candidates rights secured by the first and fourteenth amendments to the United States Constitution.[10] Beyond incontrovertible generalities concerning the

---

7. The politically volatile milieu out of which this case arises assures an over abundance of parties; nevertheless, the absence of an identity of parties would seem to obviate any problem of res judicata. Although counsel for the plaintiffs here are also counsel for the defendants in the state court case, these particular plaintiffs are not parties in the state court proceedings.

8. There is little likelihood that the Connecticut Supreme Court's application of state law will affect the posture of this case, or that that court will reach the precise constitutional issues raised here. Cf. 34 Conn.L.J. #11 at 1–2 (Sept. 12, 1972). The plaintiffs here have represented to this court, with commendable candor, that the constitutional claims asserted here were never raised in *Miller*, supra. Furthermore, neither party has requested this court to exercise its pendent jurisdiction to resolve questions of state law. In any event, pendent juris-

diction over state claims is not exercised. Cf. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

9. After a hearing pursuant to an order to show cause why a preliminary injunction should not be granted, the parties, at the suggestion of the court, agreed to consolidate that hearing with one on the merits. See Fed.R.Civ.P. 65(a)(2). Accordingly, the hearing was continued and concluded on September 15, 1972.

10. That the board plan, concededly unconstitutional at this moment, may be implemented on a provisional basis, *but only* on a provisional basis, and where the circumstances so warrant, is not here disputed. Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1962); Cummings v. Meskill, Memorandum of Decision on Intervening Plaintiff's Motion Seeking Interim Order, 347 F.Supp. 1176 (1972).

importance of the citizen's right to effectively exercise the franchise, plaintiffs have neither clearly articulated, nor provided this court with any authority which supports their contention that a constitutional right has been impaired.

██ The parties do not dispute the essential legal doctrines which underlie this case. No one disputes the primary importance of

". . . the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).

See also Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); White v. Snear, 313 F.Supp. 1100 (E.D.Pa.1970). Nor is there any doubt that "(u)ndeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." Reynolds v. Sims, *supra*, 377 U.S. at 554–555, 84 S.Ct. at 1377.

It is equally clear, on the other hand, that

"(n)o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and *the nature of their own machinery for filling local public offices."* Oregon v. Mitchell, 400 U.S. 112, 125, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Black, J.) (citations omitted) (emphasis added).

The state legislature's power to regulate, directly or indirectly, the orderly conduct of its elections is effectively plenary, within the limitations established by the United States Constitution, or any restrictions imposed by Congress under its constitutional powers. See, e. g., Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965); Reynolds v. Sims, *supra*, 377 U.S. at 586, 84 S.Ct. 1362; Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 48 L.Ed. 817 (1904); Wright v. Richter, 301 F.Supp. 1345, 1348 (D.Del.1969). Finally, it is of no significance that the object of the plaintiffs' constitutional attack is a judicial order of the state rather than a specific statute. As observed by the Supreme Court in Hughes v. Superior Court, 339 U.S. 460, 466, 70 S.Ct. 718, 722, 94 L.Ed. 985 (1950): "The fact that [Connecticut's] policy is expressed by the judicial organ of the State rather than by the legislature we have repeatedly ruled to be immaterial." [11]

What is in dispute is whether the state's action, here in the form of a judicial order, in fact violates any provision of the United States Constitution.[12]

B. *Equal Protection*

██ The main thrust of the plaintiffs' case attempts to demonstrate that the "telescoped" timetable for campaigning violates the equal protection clause of the fourteenth amendment, and it is here that the issue was joined at the hearing. In the area of voting rights, any allegation of unequal treatment, un-

---

11. The involvement of the state judiciary may be particularly appropriate in this case. Not only do Connecticut's laws envision some form of judicial involvement. Conn.Pub.Act No. 220 (May 16, 1972), but also the three-judge district court which originally declared the board plan unconstitutional recognized the desirability of local rather than federally imposed reapportionment, and invited state action intended to create a valid reapportionment plan. Cummings v. Meskill, *supra*, 341 F.Supp. at 150.

12. Although the plaintiffs' brief discusses an alleged first amendment violation, plaintiffs neither seriously pressed this issue at the hearing nor successfully described even the perimeter of the right alleged to be infringed. This court notes and rejects plaintiffs' argument in this vein.

less patently frivolous, must be scrutinized under the most exacting constitutional standards. Dunn v. Blumstein, 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Reynolds v. Sims, *supra*, 377 U.S. at 566, 84 S.Ct. 1362. It is true that the plaintiffs introduced bursts of political acumen at the hearing tending to support their view that the telescoped schedule left insufficient time for candidates to present themselves effectively to the voters, and for the voters to learn about the issues and candidates.[13] However, the plaintiffs have not shown that this "telescoped" schedule was intended to fall, or had the effect of falling, more harshly upon some candidates or voters than upon others in violation of the equal protection clause. The order as written and administered applies equally to all who compete for the same office;[14] no individual is singled out for special treatment, positive or negative. No voter is given more time than any other to study the issues or the candidates; neither is he given any less. Without regard to absolute sufficiency of the allotted time, *infra* at 1176, the time allotted is the same for all. Even if it be assumed, arguendo, that the diminished time schedule may burden the organized less than the unorganized, the skilled less than the unskilled, the experienced less than the inexperienced, this sort of burden would exist, to some extent, even under the "normal" election schedule. This "inequality of opportunity" seems to be neither more nor less than a reflection of the fact that every law, no matter how fair on its face and in its administration, affects different individuals differently, each according to his circumstances. As noted recently in another context:

> "Plaintiffs are creating a classification where none exists in order to

state their claim to fit the locutions of the Equal Protection Clause. . . . The Equal Protection Clause was not designed to eliminate inequalities existing independently of state action, but rather to preclude creation of inequalities by the state." Russo v. Shapiro, 309 F.Supp. 385, 392 (D. Conn.1969).

The plaintiffs, whether as prospective candidates or simply as voters, have not been denied equal protection by the order of the Superior Court.

## C. *Due Process*

Plaintiffs have referred generally to fourteenth amendment rights which are alleged to be in jeopardy, and have characterized the actions of the Superior Court as "arbitrary." The importance of fully protecting voters' rights warrants a brief discussion of whether the Superior Court order, applied equally to all voters and candidates, violates the due process clause of the fourteenth amendment. Having held that the "equality of opportunity" which the plaintiffs contend they are entitled to has not been constitutionally impaired by any denial of "equality," the court next focuses attention upon whether their "opportunity" has been so constrained as to effectively deny them their suffrage rights.

In considering whether malapportionment or other restrictions on the right to vote have been imposed in violation of the Constitution, the Supreme Court has most often considered the equal protection clause. See, e. g., Dunn v. Blumstein, *supra*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; Reynolds v. Sims, *supra*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506. But where applicable, the strictures of the due process clause as well must not be transgressed. See

---

13. The defendants offered evidence of the same quality to the opposite effect that there was sufficient time for these political activities. See also *infra* at 1176.

14. The validity of the reduction of representatives from 177 to 151 is not in issue,

and must be assumed to be valid. Therefore, this action is not a suitable vehicle for a class action, since the "hardship" complained of by each plaintiff varies to the extent that his former district may have been changed by the board plan.

United States v. Alabama, 252 F.Supp. 95, 106 (M.D.Ala.1966) (Johnson, J., specially concurring); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

 Without denigrating the overriding importance of the right of suffrage as the preserver of other basic civil and political rights, it does appear that voting rights and, a fortiori the corollary right of candidates to run for office,[15] are subject to *reasonable*, nondiscriminatory state regulation. Affirming this view in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 990, 3 L. Ed.2d 1072 (1959), the Court stated:

> "We do not suggest that any standards which a State desires to adopt may be required of voters. But there is wide scope for the exercise of its jurisdiction."

The Court in *Lassiter* was concerned with a nondiscriminatory literacy qualification. Here, an abbreviated election schedule is challenged. But the same "wide scope for the exercise of its jurisdiction" would seem applicable to test the constitutionality of that schedule.

Considered from one posture, there is no serious contention that the order restricted the freedoms of the plaintiffs to vote or run for office more than its purpose necessitated. Plaintiffs have admitted that the initial decision of the Superior Court that reapportionment of the Connecticut General Assembly be effectuated in time for the general election ordered for November 1972 necessitated some type of "telescoped" campaign procedures. On the other hand, it is incontrovertible that if these elections were to be held later this year, or even next year, a truncated campaign schedule would not be necessary. Plaintiffs

then characterize the choice made by the Superior Court as arbitrary, " . . . a self-imposed deadline," and conclude that no justification exists for the abbreviated campaign schedule. No doubt it would be conceivable to hold special elections for the General Assembly sometime after November 7, thus obviating the need for a "telescoped" schedule. But to argue from this alone that the decision to order reapportionment in time for state legislative candidates to be elected at the November election is arbitrary or devoid of reason borders on the frivolous. Other factors could properly be considered. The decision of the Superior Court was made in light of the Connecticut state constitution which orders that

> "(a) general election for members of the general assembly shall be held on the Tuesday after the first Monday of November, biennially, in the even-numbered years." Conn.Const. art. 3, § 8.

Also the political system for selecting candidates established by the statutes and relied upon by the Superior Court represents a legislative judgment that a "telescoped" campaign schedule would be appropriate in the event that legislative reapportionment is delayed, so that the General Assembly may be elected on November 7, 1972. Conn.Pub.Act No. 220 (May 16, 1972).

There is no doubt that the "telescoped" schedule, in conjunction with the modified assembly district lines, will require extra and accelerated efforts by town clerks, registrars, and others involved in the administration of the election.[16] The evidence supports the conclusion that all of this can be accomplished within the limitations of the "telescoped" schedule. From the other

---

15. What the Constitution requires of a political party in the nominating process remains an open question. O'Brien v. Brown, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972).

16. The plaintiffs argued that the Superior Court order will prevent absentee voters

from participating in primary elections. Their evidence, however, tended to prove that while the new schedule may burden some absentee voters, it need not prevent any from fully participating. Cf. McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

side, courts have noted, in varying contexts, the inconvenience, confusion, and increased costs for voters, candidates, and the state which postponing a scheduled election, or part of a scheduled election may effect. See, e. g., Reynolds v. Sims, *supra*, 377 U.S. at 585, 84 S.Ct. 1362; Johnson v. Hood, 430 F.2d 610, 613 (5th Cir. 1970); Reynolds v. State Election Board, 233 F.Supp. 323, 330 (W.D.Okl.1964); Hackett v. President of City Council, 298 F.Supp. 1021, 1028 (E.D.Pa.1969).

Moreover, there can be little doubt that a special election of the General Assembly held sometime after and independent of the November general election would arouse only a diminished voter interest and a smaller voter turnout [17] as compared to the November election when a President of the United States will be elected. See Valenti v. Rockefeller, 292 F.Supp. 851, 859 (W.D.N.Y.1968), aff'd, 393 U.S. 405, 89 S.Ct. 689, 21 L.Ed.2d 635 (1969). The political consequences, if any there be, of holding the election in November with a "telescoped" campaign schedule are necessarily balanced by the consequences of holding special elections after ' November 1972. Cf. Skolnick v. State Electoral Board of Illinois, 336 F.Supp. 839, 845 (N.D.Ill. 1971).

Finally, there is authoritative support for the view that the time period of August 23–November 7, 1972, is not so attentuated as to effectively deny candidates and voters a full and fair opportunity to campaign and become aware of the issues. Although not specifically concerned with the struggle of a candidate to obtain favorable reaction from all the voters, the view that thirty days is enough time for a new resident of a state to become sufficiently aware of political issues and candidates' qualifications to cast an intelligent vote has been endorsed by the Supreme Court. Dunn v. Blumstein, *supra*, 405 U.S. at 358, 92 S.Ct. 995, 1011. In the context of residency requirements the Court there noted the effect of ". . . modern communications, and . . . the clear indication that campaign spending and voter education occur largely during the month before an election, . . . ." *Id.* Whether the time schedule ordered is constitutionally acceptable in this area surely calls for a value judgment. Cf. Dunn v. Blumstein, *supra*, at 348, 92 S. Ct. 995.

It is abundantly clear that the order of the Superior Court in *Miller* does not, contrary to the plaintiffs' contention, effectively deny citizen participation in the selection of nominees to public office or in the election of those selected.[18] Nor has the evidence persuaded this court to find that this compressed time schedule is so arbitrary and capricious as to exceed the wide discretion constitutionally permitted the State of Connecticut. Cf. Reynolds v. Sims, *supra*, at 552, 84 S.Ct. 1362, 12 L.Ed.2d 506; Affeldt v. Whitcomb, 319 F.Supp. 69, 71–72 (N.D.Ind.1970), aff'd, 405 U.S. 1034, 92 S.Ct. 1304, 31 L.Ed.2d 576 (1972). Where significant state interest may be furthered from either of two policy decisions, as is the case here, the state's choice should be supported in the absence of demonstrable discriminatory purpose or effect. Cf. Valenti v. Rockefeller, *supra*, 292 F.Supp. at 862.

Upon the facts and conclusions as set forth above, the court holds that the

---

17. Statistics available in the records of the Secretary of the State of Connecticut buttress this proposition. E. g., in the 1970 special election held in the 124th Assembly District, approximately 12% of the registered voters participated. In the 1968 general election, approximately 91% of the registered voters voted for that same office.

18. Connecticut Gen.Stats. § 9–215 provides in relevant part that "(w)hen any such vacancy [in the General Assembly] occurs, the governor shall forthwith issue writs of election, . . . ordering an election to be held therein on the thirtieth day after the issue of such writs to fill such a vacancy, . . . ." and further provides for an abbreviated campaign procedure.

plaintiffs' claims that they have been deprived of their constitutional rights have not been established.[19]

Judgment should enter for the defendants on the merits and it is so ordered.

---

19. No opinion has been expressed nor is any intended with respect to the state issues presently pending before the Connecticut Supreme Court.