Bertram Harnett, J.
It is Election Day, 1976, the general elections for the presidency, and the polling places are open from 6:00 a.m. to 9:00 p.m. (Election Law, § 191, subd 2).
Suppose a qualified voter appears timely at his local polling place and is unlawfully denied the right to vote by the elections officials presiding there. Suppose, too, he is then referred to the County Board of Elections in Mineóla, and before 9:00 p.m. his right to vote is upheld by a Supreme Court Justice sitting there. Now, further suppose there is physically not enough time for the voter to return from Mineóla to his local polling place in Bellmore or Franklin Square, or wherever, before the 9:00 p.m. polls close. Would you believe the board of elections handles the problem by simply sending him out into the night with no way to vote, in effect cutting off his voting right? It really does.
*697 I hold the board of elections must do one of two alternate things under the circumstances. It must provide a facility for the exercise of that vote at the place where the voter’s application to vote is officially upheld; or, it must direct the local polling place to remain open for a reasonable period to await the voter’s arrival.
We are not now discussing a technical exercise of rummaging through the interstices of the Election Law. We are talking about disenfranchisement — the deprival of a citizen of his most cherished and fundamental American right, his right to vote. No political maneuvering here, no legal sport here, no technicality here, no "we’d like to help you, but where’s the authority” here — only the basic cornerstone of democracy to which the chisel is being applied.
Indeed, in the founding tradition of our Nation, how could I have decided these petitions otherwise? In these times, when everyone decries voter apathy, what justifies the de facto disenfranchisement of citizens who have appeared at their own polling place, and who once rebuffed actually pursue their right to vote all the way to the county seat? And, these people wait on line in both places! It is bad enough to compel their return to even a third line at the local polling place; it is worse when there is not enough time to return at all and we reward them for their interest by making it impossible to vote. Tell the young voters who are meant to be impressed by the eminence of our democratic institutions (and both our petitioners are first voters) this is fair, necessary, sensible, logical, or American.
We need not look beyond section 1 of the Fourteenth Amendment of the United States Constitution, section 11 of article I, and sections 1, 4, and 5 of article II of the New York State Constitution. When voting rights are at stake, the equal protection clause of the Fourteenth Amendment affords our citizens special shelter. (Kramer v Union School Dist., 395 US 621; Phoenix v Kolodziejski, 399 US 204; Dunn v Blumstein, 405 US 330; Matter of Atkin v Onondaga County Bd. of Elections, 30 NY2d 401.) The right to vote is fundamental. (Reynolds v Sims, 377 US 533.) It is the right which preserves all others. (Reynolds v Sims, supra; Yick Wo v Hopkins, 118 US 356.) Any procedure which curtails the right to vote must be strictly scrutinized. Such procedure is unconstitutional unless necessary to promote a compelling governmental interest. (Dunn v Blumstein, 405 US 330, supra.) As we shall see, *698 the board of elections lacks even a colorable interest in cutting off the petitioners’ right to vote.
It is, moreover, my judicial duty under subdivision 2 of section 331 of the Election Law to compel the reception of the petitioners’ votes. This section reads, in pertinent part: "[The Supreme Court or a Justice thereof], in a proceeding instituted by any voter whose application to vote has unlawfully been denied by the inspectors, shall compel by order the reception of the vote, within the hours established by law.” The Court of Appeals has declared in Matter of Holley (Rittenberg) (268 NY 484), that when a court acts within its specific electoral powers, its powers in that field are plenary.
Public policy favors increased voting liberality beyond any shadow of a doubt. Witness the new Election Law provisions for voting under an affidavit of registration (§ 412, subd 2, par [6]), the provisions adding voting time where there is a disaster (§227), the extensive absentee registration and voting scheme, the new provision for mail registration (§ 153), the lowering of the voting age to 18 (US Const, 26th Arndt), and more.
All those already within a polling place at closing time can vote regardless of the fact that 9:00 p.m. comes and goes. The polls remain open until these people vote, no matter however late. Even those outside overcrowded polling places waiting to get in are given the right to vote regardless of time. (51 NY St Dept Rep 143.) Why should someone forced by irregular official conduct to transfer from the local line to a remote central electoral processing line in the county seat be discriminated against? That person got into his polling place timely, that person was put into a waiting posture by the board of elections — why are his rights any the less? The fact that he was shunted to Mineóla for governmental convenience is immaterial. The board is charged with acting lawfully, and the courts have the power to assign Judges not only at the board of elections, but at such other locations as may be designated to hear and determine matters relating to voter eligibility. (Election Law, § 331, subd 5.) Hopefully, we are a very long way from the position where the State’s convenience deprives citizens of their rights to vote.
There is no dispute as to the facts. In the hearing on the Woodside petition, both Nassau County Commissioners of Elections appeared with their counsel. No one contested the facts and the ruling that Mr. Woodside could vote. The only *699 issues were where and how. The Woodside judicial decision was reached in Mineóla at the board of elections at twenty minutes before nine in the evening. In view of the distance to Bellmore, Mr. Woodside’s polling place, the court believed he could not, with safety, drive there in time for a 9:00 p.m. arrival. Accordingly, the court asked the commissioners if they would call the Bellmore polling place and direct their representatives to receive Mr. Woodside’s vote even if he arrived after 9:00 p.m. One commissioner refused on the record, making impossible the unanimity required of the two-person board for affirmative action. (Matter of Conlin v Kisiel, 35 AD2d 423, aifd 28 NY2d 700; Matter of Starr v Meisser, 39 AD2d 712, affd 33 NY2d 748.) Accordingly, the court directed the board to make provision for Mr. Woodside to vote under suitable conditions by paper ballot (there being no machines) at the board of elections. It was stipulated between counsel for the commissioners that the board would have the same position at any other hearings on like issues, and that there was no need for the commissioners to appear further. The court accepted that.
Incidentally, Mr. Woodside was apparently one of approximately 750 students who signed registration applications at State University in Farmingdale. Through some unknown fortuity, the vast bulk of those registrations was lost, and throngs of SUNY students appeared at the board of elections in Mineóla throughout the day. Their votes were uniformly ordered accepted by the Judges on duty. Because of problems in the new mail registration and in part the large SUNY slip-up, there were many hundreds of rejected voting applicants at the board throughout the day. The lines at the board were constant right up to 9:00 p.m. and the processing burden heavy. Kevin Woodside first appeared at his Bellmore polling place between 7:30 and 7:45 p.m., but was not actually brought by the board of elections before a Judge until 8:30 p.m.
Eighteen-year-old Lawrence Talt, on the other hand, first appeared in his Franklin Square polling place at 8:20 p.m. He was denied his right to vote and directed to Mineóla where he arrived at 8:40 p.m. His right to vote based on his personally and seasonally mailed yellow enrollment form was judicially upheld without objection at 8:59 p.m. Since he had no time at all to return to Franklin Square, his paper ballot was directed.
The normal board practice is to have judicially validated applicants return to their local polling places. In ordinary *700 years the flow is light and normally clear well before polls’ closing time. This year, however, the mail registration and other electoral factors caused a day long crush at the board. The board was previously alerted to the potential difficulty as can be seen from the unusual Nassau County procedure of placing before Election Day a number of Supreme Court Justices on standby election duty.
To me, the decision was very clear. Either the board of elections saw that the cóncededly entitled voters (holding validating court orders in their hands) were received at the local polling places, or the board itself had to receive them.
For the sake of the record, and later usefulness, I should like to discuss the principal arguments raised in prior unrecorded conferences against my proposed determination, with some comments of my own.
(1) There is no statutory authority for voting centrally.
The statute does not prohibit voting at the board of elections. Even if it did, the board had the authority and opportunity to hold the local polls open for the unlawfully deprived and delayed voters in the same manner as for those waiting on line inside or gathered outside the polling place at 9:00 p.m. Finally, no State statute or official can deprive a citizen of his constitutional right to vote. The constitutional overlay fills any crevices which may have sprung in the statutory mass.
(2) Votes must be tallied at the local polling places. We have no mechanics for counting centrally cast votes, especially for local races.
The Election Law already provides for central vote casting. It gives citizens whose registration poll cards are missing the option of completing and sealing a paper ballot. (Election Law, § 412, subd 2, par [6], cl b.) This ballot is transmitted unopened to the central board of elections. If the board finds the voter eligible, it unseals the ballot, casts it and counts it. (§ 274-a.) The ballots completed pursuant to court order could be treated in precisely the same manner. The board of elections can (and it appears in fact it does) maintain a sufficient supply of diverse paper ballots to enable voting in all contests no matter how localized.
(3) It is a nuisance for the board of elections.
Administrative convenience is no excuse for denying a citizen his voting rights. (Carrington v Rash, 380 US 89.)
(4) We cannot hold the polls open beyond 9:00 p.m.
*701 You cannot deprive a citizen of his vote. If you can hold the polls open beyond 9:00 p.m. for those in line in the polling places, and for those outside, you can also hold them open for those in line at the board of elections who would otherwise be waiting in the polling places if the board and Justice came to them. Besides, the ballots at the board could be cast by 9:00 P.M.
(5) Anyone could be pulled off the street to central voting bypassing the local polling place.
To the contrary, everyone in the ruled upon category by definition first appeared to vote at his local polling place and was directed from there to the central board of elections.
(6) Allowing central voting is to invite fraud.
To the contrary, the fraud is on the other side. The board’s present procedure and geographic operations encourages arbitrary challenges, particularly late in the day, with the hope that the voter will either go away rather than assume the bother, or will be entirely foreclosed by a delay leading to the 9:00 p.m. expiry without his vote being cast. Moreover, this voter has done more than appear, as is required of most voters —he is subject to an additional appearance before a Judge and questioning under oath. He has been to two places, one far, one near — not simply one near. His very effort is an indication of sincerity.
(7) Why bother with people who vote so late and bring the trouble on themselves?
The polls are open until 9:00 p.m. A citizen has a right to vote anytime he wishes within the lawful time mandate. He does not have to anticipate he will be unlawfully deprived of his vote. Indeed, the rule of keeping the polls open until everyone inside or outside waiting to get in is designed to favor the late voter. Almost everyone on the 9:00 p.m. lines came late, as witnessed by their posture, and they are accommodated — even if they arrived one second before 9:00 p.m. What about Kevin Woodside who arrived at his polling place to vote by 7:45 p.m., or Lawrence Talt who came to his polling place at 8:20?
(8) No one is being denied the right to vote. These people still have that right, only unavoidable circumstances prevent them from exercising it.
There are no unavoidable circumstances here — voting can easily be done centrally or at the local polls if they remain *702 available. By judicial ruling, each petitioner here is blameless. The State is responsible for maintaining procedures which make it impossible for them to vote. Accordingly, the State must provide a means for these petitioners to vote. In O’Brien v Skinner (414 US 524), the court found unconstitutional State procedures which left jailed misdemeanants and pretrial detainees with no access to vote by absentee ballot or otherwise. If the State must devise methods to make it possible for convicted criminals to vote, surely it must do the same for free citizens who have gone to considerable effort to exercise their right.
(9) Why cause the commotion? It is only a relatively few votes in the big picture.
Ask Judge Altimari and Judge Lippman who entered judicial history in Nassau County by winding up in an absolute tie in their 1964 election contest for District Court Judge. (Matter of Altimari v Meisser, 16 NY2d 629, revg 23 AD2d 865, affg 45 Misc 2d 1008; 15 NY2d 964, dsmg app 23 AD2d 672; 15 NY2d 847; 15 NY2d 686, modfg 22 AD2d 933.) (Incidentally, between 8:30 and 9:00 p.m. on November 2, 1976, there were still many people waiting at the central Mineóla board for processing.)
(10) It has never been done before.
No comment.
When we run roughshod over the voting rights of anyone, we strike at the heart of our system. I deem the issues here to be of the highest principle, and I wanted to say so.