OPINION OF THE COURT
Andrew J. DiPaola, J.
This case involves an issue which surfaces every year on exactly the same day, namely Election Day. The issue takes on even more importance when the country is in the throes of a presidential election and voting, which is normally a humdrum civic matter, becomes a matter of national concern.
The issue in question — whether an otherwise qualified voter can effectively be denied the opportunity to exercise his voting rights by the board of elections, merely because he or she appears at the board shortly before 9:00 p.m. for a court order — was presumed by the undersigned to have been laid to rest four years ago by the decision of People ex rel. Woodside v Board of Inspectors of Election of 56th Election Dist. of Town of Hempstead, Assembly Dist. No. 18, Nassau County (88 Misc 2d 696). In that scholarly decision, the Honorable Bertram Harnett pointed out the essential inequities implicit in a procedure whereby a prospective voter who, for some reason or other, has been denied the right to vote at his local polling place, and appeals to the county board of elections (where his right to vote is upheld by a Supreme Court Justice) is then told he may not cast his ballot at the county board and must go back to his local *297 polling place, although the time to vote will thereby run out thus denying the voter his inalienable right to vote. Citing section 1 of the Fourteenth Amendment of the United States Constitution, section 11 of article I, and sections 1, 4 and 5 of article II of the New York Constitution, as well as subdivision 2 of section 331 of the Election Law (now § 16-108) and numerous leading United States Supreme Court cases, Mr. Justice Harnett held as follows (supra, p 698): “All those already within a polling place at closing time can vote regardless of the fact that 9:00 p.m. comes and goes. The polls remain open until these people vote, no matter however late. Even those outside overcrowded polling places waiting to get in are given the right to vote regardless of time. (51 NY St Dept Rep 143.) Why should someone forced by irregular official conduct to transfer from the local line to a remote central electoral processing line in the county seat be discriminated against? That person got into his polling place timely, that person was put into a waiting posture by the board of elections — why are his rights any the less? The fact that he was shunted to Mineóla for governmental convenience is immaterial. The board is charged with acting lawfully, and the courts have the power to assign Judges not only at the board of elections, but at such other locations as may be designated to hear and determine matters relating to voter eligibility. (Election Law, § 331, subd 5.) Hopefully, we are a very long way from the position where the State’s convenience deprives citizens of their rights to vote.”
In the case at bar, Andrea Falcher and Janet Allen sought permission from the undersigned to vote at approximately 8:30 p.m. on a rainy election night, November 4, 1980 in Mineóla, New York. Neither woman had ever voted before. Both testified that they had filled out forms at the college where they resided, namely, Adelphi University, during a registration drive, and that they were under the impression they were registered.
With regard to the threshold issue of residence, both petitioners testified that they had resided at Adelphi University in Nassau County for the last two years and regarded Adelphi as their home and permanent residence although their parents lived in Queens County.
*298 Subdivision 2 of section 5-104 of the Election Law reads as follows: “In determining a voter’s qualification to register and vote, the board to which such application is made shall consider, in addition to the applicant’s expressed intent, his conduct and all attendant surrounding circumstances relating thereto. The "board taking such registration may consider the applicant’s financial independence, business pursuits, employment, income sources, residence for income tax purposes, age, marital status, residence of parents, spouse and children, if any, leaseholds, sites of personal and real property owned by the applicant, motor vehicle and other personal property registration, and other such factors that it may reasonably deem necessary to determine the qualification of an applicant to vote in an election district within its jurisdiction. The decision of a board to which such application is made shall be presumptive evidence of a person’s residence for voting purposes.”
It is well established that the determination of the voting residence of students is a factual one to be evaluated in terms of actual conduct (Palla v Suffolk County Bd. of Elections, 38 AD2d 84, affd 31 NY2d 36) construing section 151 of the former Election Law, which was the forerunner of subdivision 2 of section 5-104. Since residence for the purposes of registration means not only an intention to reside at a fixed place but also personal presence in that place coupled with conduct which indicates such an intent (cf. Matter of Newcomb, 192 NY 238) the court concludes from the testimony regarding their presence and present intention that both of the petitioners were “residents” at Adelphi University on Election Day, 1980 and were thus qualified to vote in Nassau County. (See, also, Matter of Cesar v Onondaga County Bd. of Elections, 54 AD2d 1108.)
By the time the court concluded the taking of testimony, it was 8:40 p.m. Inasmuch as petitioners could not possibly have reached their local polling place by 9:00 p.m. the court, under the authority of People ex rel. Woodside v Board of Inspectors of Election of 56th Election Dist. of Town of Hempstead, Assembly Dist. No. 18, Nassau County (supra), directed the Board of Elections of Nassau County to provide paper ballots for the petitioners which ballots would then be placed in a sealed locked ballot box until *299 such time as the ballots were challenged by any registered candidate or by the board of elections.
Subdivision 3 of section 16-108 of the Election Law provides as follows with regard to the procedure to be followed by a Supreme Court Justice: “Such court, in a proceeding instituted by any voter unlawfully denied the right to vote by the inspectors, shall, by order, direct that he be allowed to vote at his polling place and within the hours established by law. Such order shall, where necessary, direct the board of elections to complete the voter’s registration and enrollment records.”
As noted by Justice Harnett, following such a procedure to the letter would result in the State making it impossible for petitioners to vote. Oddly enough, although alerted to the problem four years ago, the Legislature has not yet seen fit to implement subdivision 3 of section 16-108 to provide for the exigencies presented in the case at bar.
Until such time as the Legislature sees fit to act, this court will interpret the petitioners’ “polling place” referred to in subdivision 3 of section 16-108 as the board of elections.
Indeed, the county board of elections should be the polling place of every citizen who seeks the right to vote and, having achieved that right by court order, cannot return to his local poll before the time to vote expires.
It may be argued by the board of elections that they are not equipped to handle this type of situation and to be compelled to stand ready to execute an order of this court is an imposition. I do not accept this argument. Paper ballots for every election district are prepared well in advance of the election date and are in fact delivered to each district for use in instances of affidavit voting. To retain a number of said ballots at the board of elections for use in situations such as this and thus guarantee the right to vote should be considered a privilege and not a burden by the board. It is a simple task to provide an area for the voter to mark the ballot and to have same sealed in a secure envelope duly indorsed and delivered thereafter to the respective polling places subject to the right of challenge as specified under the Election Law.
*300 In times when it is common knowledge that less than 50% of the eligible voters in this county take the time to exercise their right to vote, we should look to encourage a greater participation in the voting process and not seek to impede and restrict the right to vote.
These same aims and purposes were the motivating impetus to the creation of permanent registration, absentee balloting and absentee registration. We should continue to move ahead, not take a step backwards.