Filed 10/31/13  P. v. Starrett CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL STARRETT,<br><br>        Defendant and Appellant. | H039094<br>(Santa Clara County<br>Super. Ct. No. 210811) |

In January 2012, this court reversed the October 1, 2010 order committing Michael Starrett as a sexually violent predator (SVP) to an indeterminate term pursuant to California's Sexual Violent Predator Act (SVPA) (Welf. & Inst.Code, § 6600 et seq.).[1] We remanded the matter for consideration of his equal protection challenge in light of *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*).  We directed the superior court to suspend further proceedings on that claim pending finality of the proceedings on remand in *McKee*.  On July 24, 2012, following the San Diego County Superior Court proceedings on remand in *McKee* and McKee's ensuing appeal, Division One of the Fourth Appellate District of the Court of Appeal issued *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*).  On October 10, 2012, the California Supreme Court

---

[1]    All further statutory references are to Welfare and Institutions Code unless otherwise specified.  We take judicial notice of *People v. Starrett*, H036110, appellant's prior appeal.  (Evid. Code, §§ 452, subd. (d), 459.)

1

denied review of *McKee II* (S204503). On November 9, 2012, following the finality of the proceedings on remand in *McKee*, the Santa Clara County Superior Court again issued an order committing Starrett to an indeterminate term as an SVP.

Appellant Starrett now asserts that *McKee II* was wrongly decided and his indeterminate term of commitment violates the equal protection clause. We find no basis for reversal and affirm.

*Discussion*

A. *McKee and McKee II*

In *McKee*, the California Supreme Court recognized that persons civilly committed as MDO's or NGI's are subject to short, definite terms of commitment whereas persons found to be SVP's are committed to an indeterminate term of commitment. (*People v. McKee*, *supra*, 47 Cal.4th at pp. 1202, 1207.) The court concluded that SVP's were similarly situated to these other groups of committees. (*Id.* at pp. 1204, 1207.) It remanded the matter to the trial court "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id.* at pp. 1208-1209, fn. omitted.)

Following an extensive evidentiary hearing on remand in *McKee*, the trial court concluded the People met their burden to justify the disparate treatment of SVP's under the standards set forth in *McKee*. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1330, see *id.* at p. 1332.) On appeal, the reviewing court reached the same conclusion: "[T]he trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id.* at pp. 1330-1331.)

2

B.  *De Novo Review*

Appellant maintains that the appellate court in *McKee II* failed to properly conduct a de novo review even though the court stated that was exactly the type of review it was performing.  The appellate court stated:  "McKee asserts, and we agree, that we review de novo the trial court's determination whether the Act, as amended by Proposition 83, violates his equal protection rights.  We independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the Act.  Although the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review.  [Citations.]  Furthermore, because in this case the trial court presumably did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that SVP's pose a greater danger to society, we are in as good a position as the trial court to make that determination.  Therefore, we apply an independent standard in reviewing the trial court's order rejecting McKee's equal protection claim."  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.)

Appellant asserts the appellate court mischaracterized its duty as determining "whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests.  [Citations.]"  (*McKee II*, *supra*, 207 Cal.App.4th at p. 1339.)  The *McKee II* opinion does not suggest, however, that the appellate court used the word "substantial" to refer to the substantial evidence test rather than to the constitutional sufficiency of the evidence.  It is apparent from *McKee II* that the appellate court understood that the

3

burden was on government to present sufficient evidence to satisfy the strict scrutiny standard. (See *McKee*, *supra*, 207 Cal.App.4th at pp. 1335, 1338, fn. 3.)

Appellant contends that the court merely accepted the People's evidence as accurate, pointing out that the *McKee II* opinion did not discuss the evidence presented by McKee and did not discuss the credibility or reliability of the People's evidence. Our careful review of *McKee II* does not disclose that the appellate court failed to independently consider all the evidence presented by the parties. The appellate court indicated that McKee presented the testimony of 11 witnesses and documentary evidence. (*Id.* at p. 1332.) Even though *McKee II* did not summarize McKee's evidence, we must presume that the appellate court reviewed it. (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed."]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown"].) Moreover, the appellate court was aware of the California Supreme Court's admonition that "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments" (*McKee*, *supra*, 47 Cal.4th at p. 1210). (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.) It was not required to recite McKee's evidence.

The appellate court's description of its standard of review in *McKee II* is entirely consistent with an independent, de novo review of the evidence and the Supreme Court's opinion and guidance in *McKee*. (See *McKee*, *supra*, 47 Cal.4th at pp. 1206-1211.) We reject appellant's claim that *McKee II* applied a deferential, rather than an independent, standard of review.

C. *Strict Scrutiny*

Appellant argues that the appellate court misunderstood and misapplied the strict scrutiny standard in *McKee II*. Appellant argues that the appellate court's description of the strict scrutiny test "more closely resembles the rational basis test."

4

The appellate court in *McKee II* was certainly *not* applying the rational basis test.[2] The court stated: " 'Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment.' [Citation.] Applying the strict scrutiny standard, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. [Citation.] Alternatively stated, applying the strict scrutiny standard, a law 'is upheld only if it is necessary to further a compelling state interest.' [Citation.]" (*McKee*, *supra*, 207 Cal.App.4th at p. 1335.) The appellate court clearly understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*Id*. at p. 1349.)

---

[2] "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. [Citations.] Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. [Citations.] Further, a legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.' [Citations.] Instead, a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' [Citations.] [¶] A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' [Citations.] A statute is presumed constitutional [citation] and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' [citation] whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it ' "is not made with mathematical nicety or because in practice it results in some inequality." ' [Citation.] 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' [Citations.]" (*Heller v. Doe by Doe* (1993) 509 U.S. 312, 319-321 [113 S.Ct. 2637].)

5

The U.S. Supreme Court has used varied language to describe the strict scrutiny test consistent with the above description in *McKee II*. It has said: "[W]e have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." (*Plyler v. Doe* (1982) 457 U.S. 202, 216-217 [102 S.Ct. 2382], fns. omitted.) It has also indicated that the validity of laws burdening constitutionally protected rights challenged under the equal protection clause "depends upon whether they are necessary to further compelling state interests [citations]" (*American Party of Texas v. White* (1974) 415 U.S. 767, 780-781 [94 S.Ct. 1296] [conditions limiting access to general election ballot]; see *Dunn v. Blumstein* (1972) 405 U.S. 330, 342 [92 S.Ct. 995] [where duration residency requirements impinge on constitutional rights, the state must "demonstrate that such laws are 'necessary to promote a compelling governmental interest.' . . ."].)

In deciding whether the People satisfied the strict scrutiny test in *McKee II*, the appellate court examined evidence in three areas: recidivism, the greater trauma of victims of sexual offenses, and the diagnostic and treatment differences. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1347.) Appellant stresses that disparate treatment of SVP's must be based on reliable and accurate evidence. *McKee II* gives us no reason to believe that the evidence discussed was unreliable or inaccurate but the appellate court nevertheless accepted it as constitutionally sufficient. As the California Supreme Court has explained, the evidence produced to satisfy the strict scrutiny test must be factually based but not necessarily incontrovertible or uncontroversial. (*McKee*, *supra*, 47 Cal.4th at pp. 1210-1211.)

With respect to recidivism, the appellate court concluded that the Static–99 evidence supported "by itself, a reasonable inference or perception that SVP's pose a

6

higher *risk* of sexual reoffending than do MDO's or NGI's." (*McKee II, supra*, 207 Cal.App.4th at p. 1342.) That evidence included Department of Mental Health data "showing a significant difference between the Static–99 scores of SVP's and those of MDO's/NGI's." (*Id*. at p. 1341.) "The average Static–99 score for all SVP's civilly committed since the passage of the amended Act in 2006 [was] 6.19," which "place[d] SVP's in the 'high' risk category for sexual reoffense." (*Ibid*.) In contrast, the average Static–99 score for MDO's at Patton State Hospital subject to sex offender registration requirements in 2010 was only 3.6, which placed them "in the 'moderate-low' risk category for sexual reoffense." (*Ibid*.) The average Static–99 score for all patients discharged from Atascadero State Hospital since January 1, 2010 and subject to sex offender registration requirements, a group including MDO's and NGI's, was 4.6, which placed them "in the 'moderate-high' risk category for sexual reoffense." (*Id*. at pp. 1341-1342.)

The appellate court further concluded that there was "substantial evidence supporting the reasonable perception that the nature of the trauma caused by sex offenses is generally more intense or severe than the trauma caused by nonsex offenses and is sometimes unique to sex offenses." (*Id*. at p. 1343.) It discussed the expert testimony that it relied upon in reaching that conclusion. (*Id*. at pp. 1342-1343.)

*McKee II* also determined that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different." (*Id*. at p. 1347.) The distinctions made SVP's more difficult to treat and less likely to participate in treatment. (*Ibid*.) SVP's were "less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative." (*Ibid*.)

The evidence discussed in *McKee II* indicated that "[o]nly 2 percent of MDO's and NGI's suffer from pedophilia or other paraphilias" whereas "nearly 90 percent of SVP's

7

are diagnosed with pedophilia or other paraphilias." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1344.) "Dr. David Fennell, a psychiatrist and chief of forensics at Atascadero State Hospital, testified that about 90 percent of MDO and NGI patients suffer from a psychotic mental disorder" but "only 1 to 3 percent of SVP's suffer from a psychosis." (*Ibid.*)

There was also evidence that "[p]araphilia typically remains stable or constant throughout a patient's lifetime." (*Id*. at p. 1345.) "Although there may be an 'aging out' effect where patients' behavior or acting out on their fantasies is decreased as they age, that does not mean their urges and fantasies are similarly decreased. Patients with paraphilia generally have a specific intent in selecting victims (e.g., boys age seven to 10 years) and carefully plan and execute their offenses (e.g., by 'grooming' their victims before committing the offense). In contrast, patients with severe mental illnesses generally are not that organized and commit impulsive or opportunistic offenses." (*Ibid*.)

The appellate court in *McKee II* reviewed the evidence of significant differences in the treatment of severely mentally ill patients and patients with paraphilia. "Patients with severe mental illnesses generally are first treated with psychotropic medications and then with psychosocial support or intervention (e.g., therapy regarding communication skills, social skills, and problem solving). Their amenability to and compliance with treatment usually is very good. Most severely mentally ill patients are compliant with their medications and participate in treatment most of the time. In comparison, the treatment plans for patients with paraphilia generally involve psychosocial intervention-like treatment. Medications may decrease their sexual arousal, but not their deviant sexual interests. Treatment of paraphilia patients takes longer than for other patients because paraphilia is so pervasive, affecting their thoughts, beliefs, and interactions. . . . Also, a higher percentage of SVP's (i.e., 10 to 15 percent) have antisocial or borderline personality disorders (i.e., involving pathological lying and instability, etc.) than do severely mentally ill patients, making their treatment more difficult. Also, unlike

8

severely mentally ill patients, 'not very many' SVP's are ready to work and participate in treatment." (*Id*. at p. 1346.)

Dr. Fennell also provided testimony regarding the differences between treatment plans for SVP's and those for MDO's and NGI's. (*Id*. at p. 1345.) "MDO's, most of whom are housed at Atascadero, are overwhelmingly treated with psychotropic medications, resulting in their stabilization and amenability to psychosocial support treatment. About two-thirds of MDO's and NGI's comply with their treatment programs, typically resulting in their decertification after about three years." (*Id*. at pp. 1344-1345.) In contrast, "SVP's treatment plans are not based on medications, but rather on giving them the tools to limit their risk of sexually reoffending." (*Id*. at p. 1345.) "The shortest time in which an SVP has completed treatment is two and one-half years. Many other SVP's took up to five years to complete treatment." (*Ibid*.) But "only about 25 percent of SVP's participate in treatment." (*Ibid*.)

*McKee II* concluded "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). (*McKee*, *supra*, 47 Cal.4th at p. 1207.)" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.) It held that the SVPA as amended did not "violate McKee's constitutional equal protection rights." (*Id*. at p. 1348.)

Although there was evidence showing that SVP's pose a higher risk of sexual offending than do MDO's or NGI's, appellant criticizes the lack of evidence establishing that SVP's recidivism rate was in fact higher than MDO's or NGI's. Appellant acknowledges that "the victims of sex offenses suffer a unique and intense trauma" but he complains that the court did not compare trauma suffered by victims of SVP's to the trauma suffered by victims of MDO's and NGI's. He maintains that the constitutional question is whether SVP's are more dangerous to the community than MDO's or NGI's.

9

Appellant also asserts that the court's analysis regarding treatment and diagnosis is defective because an SVP may become eligible for release regardless of treatment. None of his criticisms undermine the appellate court's ultimate equal protection conclusion.

The evidence adduced by the People regarding the risk of harm posed by SVP's because of their greater risk of sexually reoffending and the special harm suffered by victims of sex offenses was sufficient to demonstrate that the state has a compelling interest in protecting the potential victims, and treating the mental disorders, of SVP's. In its past decisions, the California Supreme Court has acknowledged the existence of such compelling state interest. (See *McKee*, *supra*, 47 Cal.4th at p. 1204 [state has a compelling interest in protecting society from dangerous persons and treating the mental illness of civil committees]; *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 924 ["state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations], even if that risk cannot be assessed at greater than 50 percent"]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20 ["The problem targeted by the [SVPA] is acute, and the state interests — protection of the public and mental health treatment — are compelling. [Citations.]"]; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171-172, fn. omitted ["The state has compelling interests in public safety and in humane treatment of the mentally disturbed. [Citation.]"].)

As to the question whether the Act's imposition of an indeterminate term of commitment on SVP's (see § 6604) and its shifting of the burden of proof (see § 6608) are necessary to further the government's compelling state interest, the persistence and pervasiveness of the paraphilia disorders usually suffered by SVP's and their general lack of amenability to treatment must be regarded as particularly relevant to whether they pose a greater danger to society that necessitates an indeterminate term of commitment and the

concomitant shifting of the burden of proof for discharge. As indicated, the People adduced evidence that the vast majority of SVP's are diagnosed with pedophilia or other paraphilias, a paraphilia is pervasive and ordinarily persists throughout a patient's lifetime, medication does not decrease the deviant sexual interests of SVP's, treatment is not focused on medication but on tools to limit the risk of reoffense, and most SVP's do not participate in treatment. (See *McKee II*, *supra*, 207 Cal.App.4th at pp. 1344-1346.) In contrast, only a very small percentage of MDO's and NGI's suffer from pedophilia or other paraphilias, patients with severe mental illnesses are treated with psychotropic medications and then psychosocial therapy and their amenability to and compliance with treatment usually is very good, and two-thirds of MDO's and NGI's comply with their treatment programs and are typically decertified after about three years. (*Ibid.*) In light of this contrasting evidence, we discern no defect in the court's conclusion that "the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id.* at p. 1331.)

We reject appellant's suggestion that the People were required to prove that SVP's are actually more dangerous as a class than MDO's and NGI's by producing evidence allowing a comparison of recidivism rates and the harm suffered by victims of each group. For purposes of strict scrutiny, it is enough SVP's as a group differ materially from MDO's and NGI's in terms of their diagnosis and treatment and, consequently, their need for ongoing commitment.

Appellant further argues that the *McKee II* opinion is defective because the People were required to show, and the appellate court was required to find, that the disparate treatment of SVP's constituted the least restrictive means of furthering the compelling state interest. The appellate court in *McKee II* did not believe that "the equal protection clause requires that disparate treatment of similarly situated classes be not only necessary

11

to further a compelling state interest, but also accomplished through the least restrictive means available." (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1348-1349.)

We agree that the strict scrutiny test is not satisfied if there is an *equally efficacious* but less constitutionally burdensome means (i.e. "less restrictive" alternative) of accomplishing a compelling state interest because, in that case, the challenged law would not be narrowly tailored or necessary to further a compelling state interest.[3] But the appellate court in *McKee II* clearly understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*Id*. at p. 1349.) Given the evidence produced by the People that many SVP's do not participate in treatment and paraphilia disorders are pervasive, persist for a lifetime, and are not treatable with medication (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1345-1346), it appears *McKee II* reached the correct result. Appellant fails to make a persuasive argument that the SVPA's imposition of an indeterminate term of commitment and placement of the burden of proof on SVP's who petition for discharge (and the

---

3    See e.g. *Zablocki v. Redhail* (1978) 434 U.S. 374, 388 [98 S.Ct. 673] ["When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests. [Citations.]"], 389 [statute precluding state resident with judicially imposed child support obligations from marrying without court permission held unconstitutional where "the State already ha[d] numerous other means for exacting compliance with support obligations, means that are at least as effective as the instant statute's and yet do not impinge upon the right to marry"]; *Dunn v. Blumstein*, *supra*, 405 U.S. at p. 343 ["It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' [citations], and must be 'tailored' to serve their legitimate objectives. [Citation.] And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' [Citation.]."

correlative elimination of periodic jury trials in which the People have the burden of proof) are not necessary to further compelling state interests in protecting the public and providing treatment to SVP's or that a five-year term would equally effectuate those interests. Narrow tailoring to serve a compelling state interest does not require exhaustion of every conceivable alternative. (See *Grutter v. Bollinger* (2003) 539 U.S. 306, 339 [123 S.Ct. 2325].)

In addition, appellant has not suggested that further adjudication of the equal protection issue would produce significantly different evidence than presented in *McKee II*. In light of the Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings with respect to equal protection challenges in SVP cases (see *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864), the Supreme Court's denial of review in *McKee II*, and our conclusions regarding the asserted flaws in *McKee II*, we find the equal protection arguments advanced in this appeal are without merit and do not require a remand for a further evidentiary hearing.

## DISPOSITION

The November 9, 2012 order of commitment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.

14